**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ANDREW GEORGALAS, Derivatively on Behalf of MIMEDX GROUP, INC., | Case No. |
| Plaintiff, | |
| v. | |
| PARKER H. PETIT, MICHAEL J. SENKEN, WILLIAM C. TAYLOR, JOHN E. CRANSTON, TERRY DEWBERRY, JOSEPH G. BLESER, CHARLES R. EVANS, LARRY W. PAPASAN, BRUCE L. HACK, CHARLES E. KOOB, NEIL S. YESTON, and LUIS A. AGUILAR, | |
| Defendants, | |
| -and- | |
| MIMEDX GROUP, INC., a Florida corporation, | DEMAND FOR JURY TRIAL |
| Nominal Defendant. | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant MiMedx Group, Inc. ("MiMedx" or the "Company") against certain of its officers and directors for breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted billions of dollars in damages to MiMedx's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to more than a billion dollars in potential liability for violations of state and federal law.

2.      MiMedx is a biopharmaceutical company that focuses on supplying biomaterials for soft tissue repair as well as other biomaterial-based products for other medical applications. MiMedx utilizes a number of different distributors to

deliver its products.  Among those distributors is AvKARE, Inc. ("AvKARE")—a federal supply schedule contractor and wholesale distributor of pharmaceuticals, medical supplies, and other healthcare-related equipment.  As the Company admits in several of its Annual Reports filed with the SEC, the revenues derived from MiMedx's distribution agreement with AvKARE made up a significant portion of the Company's total revenue.  In 2013, for example, 56% of the Company's total revenues were attributable to its agreement with AvKARE.

3.    From 2012 through the majority of 2017, MiMedx experienced tremendous growth, including five straight years of over 50% sales growth. Throughout this time, the Individual Defendants (as defined herein), routinely touted impressive sales and revenue increases, while also forecasting significant future growth.  The Company's public filings also touted the effectiveness of the Company's internal controls over financial reporting.  Specifically, on March 15, 2013, MiMedx filed its Annual Report on form 10-K with the SEC for the fourth quarter and fiscal year ended December 31, 2012, which revealed that management's most recent assessment "concluded that, as of December 31, 2012, [MiMedx's] internal control over financial reporting … [was] effective" (an assessment the Individual Defendants would continue to boldly profess for the next five years).  The market reacted highly favorably to the Individual Defendants' rosy financial

projections and the Company's assurances that it maintained adequate internal controls, and the Company's stock price steadily skyrocketed from roughly $4 per share at the beginning of 2013 to $17 per share at the beginning of 2018, an increase of more than 76%.

4.     Unfortunately, as the Company would slowly reveal between February and July 2018, MiMedx had been operating for several years with material weaknesses in internal controls and had long been engaged in a "channel-stuffing" scheme designed to improperly recognize revenue, and would therefore need to restate a number of financial statements.  The initial hints of these startling revelations first began to trickle out in early February 2018, when MiMedx cryptically announced that it postponed its 2017 earnings release and conference call, due to "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company."  By June 2018, the Company was forced to admit that it would need to restate its financials for fiscal years 2012 through 2016, as well as the first, second, and third quarters of 2017.  According to the Company, these financial statements needed to be restated as a result of "the accounting treatment afforded to [] sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition

practices."  MiMedx further disclosed that it had been operating with a material weakness in internal controls over financial reporting during each of the above-noted periods.

5.    As the Company now admits, several years' worth of MiMedx's SEC filings "should no longer be relied upon" due to the variety of misstatements described below.  MiMedx has not timely filed and is currently incapable of filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2017. Additionally, the Company has not filed its Quarterly Reports on Forms 10-Q since October 31, 2017.

6.    The Individual Defendants' faithless actions and repeated improper statements have devastated MiMedx's credibility as reflected by the Company's more than $1.5 billion, or 75% market capitalization loss, from a high of nearly $2 billion in January 2018, to less than $450 million as of July 2018.

7.    Further, the wrongdoing complained of herein[1] has spawned a plethora of lawsuits and governmental investigations.  First, the Company is now the subject of at least two federal securities class action lawsuits filed in the United States

---

[1] In addition, to the allegations discussed above, MiMedx has also come under scrutiny for failing to disclose payments the Company made to a number of doctors in violation of the Physician Payments Sunshine Act.

District Court for the Northern District of Georgia on behalf of investors who purchased MiMedx's shares (the "Securities Class Actions"). The Securities Class Actions bring claims against MiMedx and defendants Parker H. Petit ("Petit") and Michael J. Senken ("Senken") in connection with the Company's misleading statements and improper revenue recognition practices, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Securities Class Actions allege that, to meet revenue expectations, MiMedx employed "channel-stuffing," falsely inflating its sales and revenues by passing off inventory to its distributors far in excess of what was required and requested. In addition, as a direct result of this unlawful course of conduct, the Company is now the subject of investigations by the SEC, U.S. Department of Justice ("DOJ"), and Department of Veterans Affairs ("VA").

8.    On April 10, 2018, on behalf of plaintiff, a MiMedx stockholder, plaintiff's counsel sent a litigation demand (the "Demand") to the Board of Directors of MiMedx (the "Board"), demanding that the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging MiMedx, including certain of the Company's current and former officers and directors.

9.     Nearly three months after plaintiff sent his Demand, the Company finally responded.  In a letter dated July 2, 2018, counsel claimed that a Special Committee ("Special Committee") of the Board informed plaintiff of the Special Committee's formation and that it would be considering plaintiff's demand.  Counsel provided no explanation for the delay.

10.     In a response letter dated July 20, 2018, plaintiff urged the Special Committee to also consider, among other things, the recent and sudden resignations of the Company's Chief Executive Officer ("CEO"), defendant Petit, as well as its President and Chief Operating Officer ("COO"), William C. Taylor ("Taylor").  As plaintiff explained in the July 20, 2018 letter, these resignations arose in connection with an investigation by the Audit Committee into the Company's accounting on certain distributor contracts.  Plaintiff further expressed his concern over the Board's delay in investigating these matters.  In particular, plaintiff noted that it took three months for the Board to even begin its investigation.

11.     More than five months have now passed since plaintiff demanded MiMedx investigate the allegations detailed herein, and the Special Committee has yet to wrap up its investigation.  The Board's investigation into these matters, however, began even before plaintiff sent his Demand.  According to the Company's public filings with the SEC, the investigation has been ongoing since at least January

2018, and as counsel for the Special Committee admitted, "the Audit Committee has been investigating these matters for several months….."  Accordingly, while the Board has had ample time to conduct an investigation and determine on the basis of that investigation that the Demand's factual allegations and legal claims have merit, it has inexplicably dragged on.

12.    In light of the Company's unreasonable delay in investigating these matters, plaintiff now files this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

13.    Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

14.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive

offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to MiMedx, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

16.     Plaintiff Andrew Georgalas ("Georgalas") is and has continuously been since 2014 a stockholder of MiMedx.  Plaintiff Georgalas is a citizen of Pennsylvania.

**Nominal Defendant**

17.     Nominal Defendant MiMedx is a Florida corporation with principal executive offices located at 1775 West Oak Commons Court, NE, Marietta, Georgia. Accordingly, MiMedx is a citizen of Florida and Georgia.  MiMedx is a biopharmaceutical company that develops, manufactures, and markets regenerative biomaterial products processed from human placental tissue, skin, and bone.  As of December 31, 2016, MiMedx had approximately 690 employees.  MiMedx was

formed on March 31, 2008, as a result of a reverse merger transaction between Alynx, Co. ("Alynx") and MiMedx, Inc. ("Legacy MiMedx").

**Defendants**

18.    Defendant Petit was a MiMedx director from September 2009 to September 2018; Chairman of the Board and CEO from February 2009 to June 2018; and President from February 2009 to September 2009.  Defendant Petit is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Petit knowingly, recklessly, or with gross negligence caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects.   MiMedx paid defendant Petit the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2016 | $602,904 | - | $1,088,080 | - | - | $2,796 | $1,693,780 |
| 2015 | $560,177 | - | $1,071,447 | - | $517,254 | $2,975 | $2,151,853 |
| 2014 | $514,892 | $400,000 | $862,448 | $672,968 | $580,800 | $4,683 | $3,035,791 |
| 2013 | $465,192 | - | $548,340 | $954,043 | $292,521 | - | $2,260,096 |

Defendant Petit is a citizen of Georgia or Florida.

19.    Defendant Michael J. Senken ("Senken") was MiMedx's Chief Financial Officer ("CFO") from January 2010 to June 2018. Defendant Senken is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Senken knowingly, recklessly, or with gross negligence caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects. MiMedx paid defendant Senken the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $365,039 | $324,800 | - | - | - | $689,839 |
| 2015 | $329,615 | $300,108 | - | $236,300 | - | $866,023 |
| 2014 | $294,990 | $115,666 | $211,822 | $242,000 | $15,438 | $879,916 |
| 2013 | $268,269 | $172,043 | $278,079 | $121,884 | - | $840,275 |

Defendant Senken is a citizen of Georgia.

20.    Defendant Taylor was MiMedx's COO and President from September 2009 to June 2018 and a director from October 2011 to June 2018. Defendant Taylor knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's

press releases and public filings concerning the Company's business, operations, and prospects. MiMedx paid defendant Taylor the following compensation as a director:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $502,170 | $690,200 | - | - | $4,086 | $1,196,456 |
| 2015 | $451,131 | $685,783 | - | $391,980 | $2,654 | $1,531,548 |
| 2014 | $422,042 | $264,303 | $484,043 | $477,950 | $2,799 | $1,651,137 |
| 2013 | $385,577 | $377,670 | $649,034 | $240,721 | - | $1,653,002 |

Defendant Taylor is a citizen of Georgia.

21.    Defendant John E. Cranston ("Cranston") was MiMedx's Treasurer since at least June 2018, and Vice President and Corporate Controller from at least October 2013 to June 2018. Defendant Cranston knowingly, recklessly, or with gross negligence caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects. Defendant Cranston is a citizen of Georgia.

22.    Defendant J. Terry Dewberry ("Dewberry") is a MiMedx director and has been since September 2009. Defendant Dewberry is also Chairman of MiMedx's Audit Committee and a member of that Committee and has been since at least October 2012. Defendant Dewberry knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues

- 11 -

for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects. MiMedx paid defendant Dewberry the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $69,000 | $150,003 | - | $219,003 |
| 2015 | $69,000 | $127,492 | - | $196,492 |
| 2014 | $69,000 | $56,520 | $55,350 | $180,870 |
| 2013 | $80,250 | $33,000 | $53,940 | $167,190 |

Defendant Dewberry is a citizen of Georgia.

23.    Defendant Joseph G. Bleser ("Bleser") is a MiMedx director and has been since September 2009. Defendant Bleser is also a member of MiMedx's Audit Committee and has been since at least October 2012. Defendant Bleser knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects. MiMedx paid defendant Bleser the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $69,000 | $150,003 | - | $219,003 |
| 2015 | $69,000 | $127,492 | - | $196,492 |
| 2014 | $67,500 | $56,520 | $55,350 | $179,370 |
| 2013 | $78,500 | $33,000 | $53,940 | $165,440 |

Defendant Bleser is a citizen of Georgia.

24.    Defendant Charles R. Evans ("Evans") is MiMedx's Chairman of the Board and has been since July 2018 and a director and has been since September 2012. Defendant Evans was also Lead Director of MiMedx since at least July 2018. Defendant Evans is also a member of MiMedx's Audit Committee and has been since at least October 2012. Defendant Evans knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects. MiMedx paid defendant Evans the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $53,000 | $150,003 | - | $203,003 |
| 2015 | $53,000 | $127,492 | - | $180,492 |
| 2014 | $52,500 | $56,520 | $55,350 | $164,370 |
| 2013 | $60,250 | - | - | $60,250 |

Defendant Evans is a citizen of Georgia.

25.    Defendant Larry W. Papasan ("Papasan") is a MiMedx director and has been since March 2008. Defendant Papasan was also an Alynx director from February 2008 to March 2008 and a Legacy MiMedx director from April 2007 to February 2008. Defendant Papasan was also a member of MiMedx's Audit

Committee from at least October 2012 to at least April 2017.  Defendant Papasan

knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate

internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an

illicit channel-stuffing scheme; and (iv) make improper statements in the Company's

press releases and public filings concerning the Company's business, operations, and

prospects.   MiMedx paid defendant Papasan the following compensation as a

director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $72,500 | $150,003 | - | $222,503 |
| 2015 | $72,500 | $127,492 | - | $199,992 |
| 2014 | $72,750 | $56,520 | $55,350 | $184,620 |
| 2013 | $84,750 | $33,000 | $53,940 | $171,690 |

Defendant Papasan is a citizen of Tennessee.

26.    Defendant Bruce L. Hack ("Hack") is a MiMedx director and has been

since December 2009.  Defendant Hack knowingly or recklessly caused or allowed

MiMedx to:  (i) operate with inadequate internal controls; (ii) overstate its revenues

for a number of years; (iii) engage in an illicit channel-stuffing scheme; and

(iv) make improper statements in the Company's press releases and public filings

concerning the Company's business, operations, and prospects.   MiMedx paid

defendant Hack the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $48,000 | $150,003 | - | $198,003 |
| 2015 | $48,000 | $127,492 | - | $175,492 |
| 2014 | $48,000 | $56,520 | $55,350 | $159,870 |
| 2013 | $52,750 | $33,000 | $53,940 | $139,690 |

Defendant Hack is a citizen of New York.

27.    Defendant Charles E. Koob ("Koob") is a MiMedx director and has been since March 2008.  Defendant Koob was also an Alynx director from February 2008 to March 2008 and a Legacy MiMedx director from April 2007 to February 2008.  Defendant Koob knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects.  MiMedx paid defendant Koob the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $42,000 | $150,003 | - | $192,003 |
| 2015 | $42,000 | $127,492 | - | $169,492 |
| 2014 | $42,000 | $56,520 | $55,350 | $153,870 |
| 2013 | $44,500 | $33,000 | $53,940 | $131,440 |

Defendant Koob is a citizen of Wyoming.

28.    Defendant Neil S. Yeston ("Yeston") is a MiMedx director and has been since September 2012.  Defendant Yeston knowingly or recklessly caused or

allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects.  MiMedx paid defendant Yeston the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2016 | $50,500 | $150,003 | - | $200,503 |
| 2015 | $50,500 | $127,492 | - | $177,992 |
| 2014 | $50,750 | $56,520 | $55,350 | $162,620 |
| 2013 | $57,500 | - | - | $57,500 |

Defendant Yeston is a citizen of Connecticut or Massachusetts.

29.    Defendant Luis A. Aguilar ("Aguilar") is a MiMedx director and has been since March 2017.  Defendant Aguilar knowingly or recklessly caused or allowed MiMedx to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; and (iv) make improper statements in the Company's press releases and public filings concerning the Company's business, operations, and prospects.  Defendant Aguilar is a citizen of Georgia.

30.    The defendants identified in ¶¶18-21 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶22-29 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶22-25 are referred to

herein as the "Audit Committee Defendants." Collectively, the defendants identified in ¶¶18-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

Fiduciary Duties

31.     By virtue of their positions as officers, directors, and/or fiduciaries of MiMedx and because of their ability to control the business and corporate affairs of MiMedx, the Individual Defendants owed MiMedx and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were, and are, required to use their utmost ability to control and manage MiMedx in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of MiMedx and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes MiMedx and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MiMedx, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

- 17 -

Because of their advisory, executive, managerial, and directorial positions within MiMedx, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

33.    To discharge their duties, the officers and directors of MiMedx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of MiMedx were required to, among other things:

       (a)    ensure MiMedx maintained adequate internal controls over accounting and financial reporting;

       (b)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

       (c)    ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct;

       (d)    ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(e)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f)    remain informed as to how MiMedx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(g)    truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties Under the Company's Code of Business Conduct and Ethics**

34.    The Individual Defendants, as well as all employees, directors, and officers of the Company, were and are required to comply with the MiMedx Group, Inc. Code of Business Conduct and Ethics (the "Code of Conduct").  The purpose of the Code of Conduct is, *inter alia*, to promote:  (i) "honest and ethical conduct"; (ii) "full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC] and in other public communications made by the Company"; (iii) "compliance with applicable

governmental laws, rules, and regulations"; and (iv) "the prompt internal reporting
to an appropriate person or persons identified in the Code of violations of the Code."

35.     The Code of Conduct mandates that the Individual Defendants'
activities comply with all laws and regulatory requirements.  Specifically, the Code
of Conduct states:

> 4. Compliance with Laws.  The Company's policy is to operate its
> businesses in strict compliance with all laws and regulatory
> requirements. Under no circumstances shall a Covered Person take any
> action on behalf of the Company that he or she knows or reasonably
> should know violates any applicable law or regulation. Every Covered
> Person is expected to be familiar with the basic legal and regulatory
> requirements that apply to his or her duties on the job. An employee
> who needs help to understand his or her legal obligations is expected to
> ask a manager, or higher level executive, the Corporate Compliance
> Officer, the Human Resources Department, or a Company attorney for
> instruction or advice.

36.     In addition, the Code of Conduct provides that the Company's
employees, including its officers and directors, ensure that MiMedx's public filings
and communications are "full, fair, accurate, timely, and understandable."  Further,
the Code of Conduct specifically notes the importance of reporting financial
information reasonably and accurately to investors and the broader market, and
obligates those who prepare or verify public reports or communications to "take this
responsibility very seriously." The Code of Conduct states:

> 5. Disclosure. The Company applies the highest ethical standards in its
> financial and non-financial public reporting and follows all applicable

SEC, NASDAQ and other standards and rules regarding reporting. ***It is of critical importance that all disclosures and announcements made by the Company to security holders or the investment community be accurate and complete, fairly present, in all material respects, the subject matter of the disclosure, and be made on a timely basis.*** Covered Persons who prepare disclosures or review information that will be included in the Company's filings with the SEC or other government agencies or otherwise disclosed to the public ***must take this responsibility very seriously. Such Covered Persons must provide information that is relevant, objective, accurate and complete to promote full, fair, accurate, timely and understandable disclosures.*** Each Covered Person has the responsibility to immediately report to appropriate Company personnel or the Audit Committee any information that he or she becomes aware of that affects disclosures made by the Company.

37.     The Individual Defendants were also responsible for overseeing the

"fair, prompt and consistent enforcement of [the Code of Conduct]."  The Code of

Conduct obligated the Individual Defendants to promptly bring certain matters to

the attention of the Audit Committee:

8. Enforcement.

8.1 The Company's Corporate Compliance Officer --in coordination with ***senior management and, where appropriate, the Board of Directors and the Audit Committee-- is responsible for overseeing the fair, prompt and consistent enforcement of this Code, including the investigation of possible violations and the undertaking of remedial actions. Actions prohibited by this Code involving directors or executive officers must be reported to the Audit Committee.*** After receiving a report of an alleged prohibited action by a director or executive officer, the Audit Committee must promptly take all appropriate actions necessary to investigate and recommend to the Board of Directors any appropriate remedial actions.

8.2 The Corporate Compliance Officer shall report all matters to the Chairperson of the Audit Committee relating to any (i) alleged violation of the Code by any director or executive officer (ii) complaints, reports, or concerns regarding financial statement disclosures, accounting, internal accounting controls, or auditing matters (collectively, "**Accounting Matters**"); (iii) violation of applicable securities laws, rules, and regulations relating to financial reporting; (iv) retaliation against any employees who make any allegations relating to (i) – (iii) above; and (v) other matters required to be addressed by the Audit Committee (A) set forth in the Reporting Procedures for Accounting Matters, the Charter of the Audit Committee, or otherwise, and (B) pursuant to all applicable laws, rules, and regulations.

**Additional Duties of the Audit Committee Defendants**

38.     Under the MiMedx Board's Audit Committee Charter, the Audit Committee Defendants, defendants Bleser, Dewberry, Evans, and Papasan, owe and/or owed specific additional duties to MiMedx.   According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements, the Company's accounting and financial reporting processes, and internal controls over financial reporting.  In overseeing the Company's financial reporting processes on behalf of the Board, the Audit Committee is tasked with the following functions:

(a) Oversee and monitor the activities of Company management and outside auditors with respect to the Company's accounting and financial reporting processes;

*   *   *

(d) Review the proposed scope and plan of the annual audits of the financial statements and internal control over financial reporting;

(e) Direct the Company's outside auditors to review the Company's interim financial statements included in Quarterly Reports on Form 10-Q prior to the filing of such reports with the SEC;

(f) Review and discuss with management and the Company's auditors the Company's annual audited financial statements and quarterly financial statements;

(g) Review with management, before release, the Company's audited financial statements and Management's Discussion and Analysis included in the Company's Annual Report on Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K;

(h) Review and discuss with the Company's outside auditors the Company's audited financial statements and audit findings and discuss with the outside auditors those matters required to be discussed by Statement of Auditing Standards No. 114, as amended, or such successor standard as may be promulgated by the Public Company Accounting Oversight Board ("PCAOB");

\*   \*   \*

(k) Review with the Company's outside auditors and management the adequacy of the Company's internal financial controls and reporting systems;

(l) Review the outside auditors' management letter (if any) and consider any comments made by the outside auditors with respect to improvements in the internal accounting controls of the Company, consider any corrective action recommended by the outside auditors, and review any corrective action taken by management;

\*   \*   \*

(n) Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters;

(o) Establish procedures for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

(p) Review and approve related party transactions for potential conflicts of interest;

\*   \*   \*

(t) Establish and review reporting procedures for accounting matters; and

(u) Review compliance and risk assessment reports from management.

39.    In addition, the Audit Committee Defendants were obligated to investigate any complaint, report, or concern relating to:    (i) questionable accounting, internal accounting controls, and auditing matters; (ii) violations of applicable securities laws, rules, and regulations relating to financial reporting; (iii) violations of the Company's Code of Conduct by any executive, officer, director, or any other person who performs functions of the principal executive officer, principal financial officer, principal accounting officer or controller; and (iv) retaliation against employees who made any of the foregoing allegations.  The MiMedx Group, Inc. Reporting Procedures for Accounting Matters states:

**<u>Treatment of Complaints, Reports, and Concerns.</u>**

Upon receipt of a complaint, report, or concern relating to any Allegation or Retaliatory Act, or notification by the Company, an officer, or member of the Board of Directors that it (or he or she) has received such a complaint, report, or concern, the Chairperson of the Audit Committee will notify the other members of the Audit Committee. The Audit Committee shall then investigate the complaint, report, or concern. In conducting such investigation, the Audit Committee may enlist officers or employees of the Company and/or outside legal, accounting, or other advisors, as appropriate. Promptly following the completion of such investigation, the Audit Committee will recommend that the Board of Directors take such corrective and disciplinary actions, if any, that are warranted in the judgment of the Audit Committee, which may include, without limitation, a warning or letter of reprimand, demotion, salary reduction, loss of eligibility for a salary increase, bonus, or equity compensation, suspension without pay, or termination of employment.

The Company will not take any adverse action against anyone as a result of their submission of a good faith complaint, report, or concern pursuant to these procedures and will not discharge, demote, suspend, threaten, harass, or in any manner discriminate against any employee in the terms and conditions of employment based upon any lawful actions taken by the employee with respect to good faith reporting of complaints, concerns, or other matters regarding the Company or otherwise as specified in Section 806 of the Sarbanes-Oxley Act of 2002 or any other applicable laws, rules, and regulations. Additionally, no employee shall be adversely affected because the employee refuses to carry out a directive which, in fact, constitutes corporate fraud, or is a violation of state or federal law or the Company's Code of Business Conduct and Ethics.

## Breaches of Duties

40.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and

directors of MiMedx, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to: (i) operate with inadequate internal controls; (ii) overstate its revenues for a number of years; (iii) engage in an illicit channel-stuffing scheme; (iv) make improper statements to the public and the Company's stockholders; and (v) pay improper compensation packages to certain defendants. These improper practices wasted the Company's assets, and caused MiMedx to incur substantial damage.

42.    The Audit Committee Defendants had a duty to review the Company's earnings, press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee MiMedx's public statements and internal control functions.

43.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from

taking such illegal actions. In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Actions that allege violations of federal securities laws. Furthermore, the Individual Defendants' improper conduct has also spawned governmental investigations by the SEC, DOJ, and VA. As a result, MiMedx has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of MiMedx, as to the Company's operations, financial condition, and compliance policies; (ii) deceive and exploit customers through their improper channel-stuffing scheme; and (iii) enhance the Individual Defendants' executive and directorial positions at MiMedx and the

- 27 -

profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

46. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During all times relevant hereto, the Individual Defendants caused the Company to engage in the improper channel-stuffing scheme and issue improper financial statements.

47. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

48. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the illegal channel-stuffing scheme and mislead the investing public regarding the Company's internal controls and Board oversight. Because the actions described herein occurred under the authority of the Board, each

of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## MIMEDX'S RELATIONSHIP WITH AVKARE

50.   MiMedx is a biopharmaceutical company that develops, manufacturers, and markets biomaterials utilizing human placental allografts for soft tissue repair and other medical applications.  In 2012 MiMedx entered into a distribution agreement with AvKARE, a federal supply schedule contractor.  Under the distribution agreement, AvKARE would be the exclusive distributor of MiMedx products to federal agencies including the VA and the Department of Defense.

51.   The revenues derived from MiMedx's distribution agreement with AvKARE made up a significant portion of the Company's total revenue.  In 2013,

2014, and 2015 for example, 56%, 34%, and 24%, respectively, of the Company's total revenues were attributable to its agreement with AvKARE.

## MIMEDX'S IMPROPER REVENUE RECOGNITION SCHEME CONTINUED FOR SEVERAL YEARS

52.    For years, in order to meet revenue expectations, MiMedx employed a "channel-stuffing" scheme, artificially inflating its sales and revenues by shipping inventory to its distributors and customers while knowing that such products had not been requested and could not be resold.  This "channel-stuffing" scheme implicates AvKARE, a federal contractor who entered into a distribution agreement with MiMedx, and the VA, an end customer of MiMedx products.

53.    A *Wall Street Journal* investigative report titled "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth," dated July 23, 2018, detailed the channel-stuffing at MiMedx.  *The Wall Street Journal* investigation, based on a review of Company emails, court documents, internal complaints, and interviews with current and former MiMedx employees, revealed "a company seeking to grow at almost any cost."  In the *Wall Street Journal* article, several current and former MiMedx employees explained that MiMedx would ship more product than had been ordered and book them as sales, improperly accelerating the recognition of revenue. In particular, the *Wall Street Journal* article stated:

VA hospitals and clinics were crucial to the company's revenue growth, said former employees.  The U.S. government accounted for more than a fifth of MiMedx's revenue, by one analyst's estimate.  A spokesman for the VA's Office of the Inspector General declined to comment on MiMedx, citing an investigation by the IG.

Many VA hospitals do business with MiMedx on a consignment basis, meaning the company sends them products and is paid only when the VA uses some of them.  Storing voluminous merchandise on VA shelves became a challenge, former MiMedx employees said. "We would find ways to hide it," said one.

An August 2017 email received by regional sales directors said consignment inventory outstanding just in the Southwest region was worth some $34 million. For perspective, that was equal to more than 10% of reported sales companywide in the previous year.

Several former employees said that at times, near the end of a quarter, the company would book as sales some of the goods sent to hospitals on consignment but not yet used.

*   *   *

In one instance, MiMedx sales records show the company recorded a shipment of 135 oversized skin grafts to a Las Vegas plastic surgeon's office, which former employees said is way beyond the 10 or so smaller pieces in a typical physician order. The shipment was recorded at 8 p.m. on Sept. 29, 2016, just before the end of a quarter.

No one in the surgeon's office had ordered the goods, according to a former employee of the office.

The surgeon refused to pay for the grafts, which were billed at about $270,000 and shipped to a FedEx Corp. office for pickup, the former office employee said.

A FedEx receipt reviewed by the Journal said the shipment was picked up the next day by someone representing the surgeon. The former

surgeon's-office employee said no one from the office collected the goods.

The former employee said that, when shown a security video from the location, he recognized the person who had signed for the pickup as a representative for a company that did business with MiMedx. The former employee said the surgeon chose not to pursue the matter with police.

54.     In addition, former MiMedx employees recounted that near the end of every month or quarter, the Company's senior management pressured sales representatives to increase sales volumes.  One former employee reported receiving a text message saying, "What else can u ship by end of month?" and "Need all you can put in today up to $100k if possible."  Mary Armstrong ("Armstrong"), a former MiMedx account executive, similarly reported that superiors would tell her "I need you to hit this number."  Armstrong further stated:  "I still have PTSD from the amount of calls I'd get asking what my numbers were going to be for the month."

55.     While the Company said it encouraged employees to speak up if they saw problems at the Company, former employees disagreed.  According to the *Wall Street Journal* article, employees who brought these issues to the Company's attention were subject to retaliation.  In fact, the *Wall Street Journal* article reported that at least eight former employees were fired after raising concerns with MiMedx's senior management.  Armstrong, for example, explained that she complained about what she considered improprieties, such as third-party distributors overcharging

hospitals for MiMedx products to executives, including defendant Petit. Despite defendant Petit assuring her that he "would fix the problem," the misconduct continued and she was fired soon after. Two former MiMedx regional sales directors reported similar experiences: Jennifer R. Scott explained that she was fired after identifying the mislabeling of surgical implants to her supervisors, and Tom Tierney reported that he was fired roughly a week after reporting what he called "a mind-boggling level of sales and accounting irregularities," to defendant Petit and the Board.

### MIMEDX FAILED TO DISCLOSE ITS FINANCIAL TIES TO PHYSICIANS IN VIOLATION OF FEDERAL LAW

56.    As the Company came under scrutiny for its improper revenue recognition scheme, other wrongdoing at MiMedx also began to come to light. On February 22, 2018, *The Wall Street Journal* published an article titled "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors," reporting that MiMedx violated the Physician Payments Sunshine Act by failing to disclose payments the Company made to more than twenty doctors.[2]

---

[2] The Physician Sunshine Act requires most biotechnology companies and drug and medical-device manufacturers to disclose payments or gifts they make to doctors and teaching hospitals.

MiMedx's executives contended that its products, made from donated placental tissue, were not among those that required a disclosure of doctor payments. MiMedx's website stated that it had "received an opinion from CMS which confirms that MiMedx does not have a need to report at this time."  However, Tony Salters, a spokesperson for the Centers for Medicare and Medicaid Services ("CMS"), the government agency that oversees the program, told *The Wall Street Journal* that the agency does not provide such opinions in writing or otherwise; rather it provides general guidance that companies can consider.  Moreover, at least one of MiMedx's direct competitors, Osiris Therapeutics Inc., regularly provides information on its ties to doctors.  The *Wall Street Journal* article stated:

> MiMedx Group Inc., MDXG +3.43% a fast-growing tissue-graft developer, has financial ties to more than 20 doctors, according to a review of doctors' disclosures by The Wall Street Journal, but the company hasn't reported these payments to the government under a 2013 law.

> The company says its products, made from donated placental tissue, aren't among those that require a disclosure of doctor payments. At least one of MiMedx's direct competitors, Osiris Therapeutics Inc., regularly provides information on its ties to doctors and reported $1.03 million in such payments in 2016.

> \* \* \*

> Since 2013, most biotechs, drug and medical-device makers have been required to disclose payments or gifts they make annually to doctors and teaching hospitals, under the Physician Payments Sunshine Act. The law purports to educate patients about financial ties between

doctors and drug companies and to "stop dishonest influence on research, education, and clinical decision-making," according to the Centers for Medicare and Medicaid Services, the government agency that oversees the program.

Every June, CMS publishes data detailing the prior year's payments to doctors for consulting fees, as well as for entertainment, research, speaking fees and travel costs. The most recent data, from 2016, shows that manufacturers made $8.19 billion in such payments.

The CMS website shows no record of stock grants, speakers' fees and research support provided by MiMedx to doctors and their hospitals in recent years, though its financial relationships with at least 20 doctors appear in public disclosures that were reviewed by the Journal.

Executives at MiMedx contend the company doesn't have to report its payments to physicians because its products are classified as tissues under Section 361 of the Public Health Service Act and it is therefore not a "applicable manufacturer."

MiMedx's website states that it has "received an opinion from CMS which confirms that MiMedx does not have a need to report at this time."

But Tony Salters, a CMS spokesman, said the agency doesn't provide such opinions. Outside of a compliance action, he said in an email, the agency doesn't give individual determinations, in writing or otherwise; rather, it provides general guidance that companies can consider.

Asked how MiMedx could have received an opinion from an agency that says it doesn't provide them, Parker H. "Pete" Petit, MiMedx's chief executive, referred questions to Andy Ruskin, at Morgan, Lewis & Bockius in Washington, D.C., MiMedx's regulatory lawyer.

Mr. Ruskin declined to discuss specifics about MiMedx's discussions with CMS. In general, he said, "how you act on the feedback you are getting from the government is going to be the same irrespective of whether the government labels what they issue an opinion or labels it as guidance or does not provide any label whatsoever."

- 35 -

A company that knowingly fails to report doctor or hospital payments can face a maximum penalty of $1 million a year.

Asked about MiMedx's payments, Mr. Petit said, "We have very few agreements with doctors."

However, details of financial relationships between MiMedx and at least 20 doctors appear in public disclosures required by medical associations, including the North American Spine Society and the American Urological Association, when doctors appear on panels, publish papers or make presentations at conferences.

Doctors' disclosures to the spine society show MiMedx paid the Hospital for Special Surgery in New York City as much as $500,000 in 2017 for research conducted by Alexander P. Hughes, a spinal surgeon, and Andrew A. Sama, an associate attending orthopedic surgeon. In 2015 and 2016, MiMedx made payments of as much as $70,000 to the hospital. The payments, disclosed in ranges rather than precise amounts, support research using a MiMedx product in spinal surgery to see if it decreases the need for subsequent operations.

A hospital spokeswoman said the project is ongoing and declined to comment on the payments. She declined to make the doctors available.

Lee C. Rogers, managing partner of Amputation Prevention Experts Health Network, began receiving hourly consulting payments from MiMedx around 2013, he said in an interview, adding that he stopped working for MiMedx in 2015 because his practice changed.

In 2014, Dr. Rogers ran unsuccessfully for Congress in California. Federal Election Commission records show Mr. Petit, MiMedx's founder, and his wife, Janet, contributed $5,200 to the Rogers campaign. Both Dr. Rogers and Mr. Petit confirmed the donation.

When the Physician Payments Sunshine Act went into effect in 2013, Dr. Rogers criticized its disclosure requirements in a post on a podiatry website. The law, he said, would have a "tragic" impact on industry conferences because it could reduce "sponsorships from drug and device companies." He declined to provide his current views.

57.     On this news MiMedx's stock price fell $1.05 per share, or approximately 12%, on February 22, 2018, to close at $7.83 per share on February 23, 2018, erasing more than $116 million in market capitalization.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY RESULTED IN A SERIES OF IMPROPER STATEMENTS

58.     The Individual Defendants are responsible for disseminating numerous improper statements concerning the Company's internal controls and its financial condition from at least March 2013 to January 2018.  In particular, the Individual Defendants repeatedly boasted that the Company's "disclosure controls and procedures were effective," while also highlighting MiMedx's purportedly impressive sales and revenue growth.  As the Company was ultimately forced to admit, all of these statements were distressingly inaccurate.  In fact, the Company continued to operate with material weaknesses in financial controls and improperly recognized revenue throughout this time.

59.     On March 7, 2013, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2012.  For the full year fiscal 2012, the Company reported a net loss of $7.7 million, or $0.09 per diluted share, on revenue of $27.1 million, compared to a net loss of $10.2 million, or $0.14 per diluted share, on revenue of $7.8 million for 2011.  For the quarter, the Company reported a net loss of $1.6 million, or $0.02

per diluted share, on revenue of $10.5 million, compared to a net loss of $2.6 million, or $0.03 per diluted share, on revenue of $2.6 million, for the same period in the prior year.  Defendant Petit highlighted the "record revenue" and "excellent year" MiMedx had, emphasizing that the Company "produced revenue growth of over three times the previous year."  The press release stated:

**Highlights of 2012 Results include:**

• *Tripling of Revenue over 2011*
• First full year of positive Adjusted EBITDA
• Adjusted EBITDA increased by nearly $9 million
• Gross Margins at record level of 81%

**Full Year and Fourth Quarter 2012 Results**

*The Company recorded record revenue for the year ended December 31, 2012, with revenue of $27.1 million, more than three times 2011 full year revenue of $7.8 million.* Earnings before interest, taxes, depreciation, amortization, impairment of intangibles, earn-out liability and share based compensation (Adjusted EBITDA*) for the year ended December 31, 2012, were $2.4 million, a $8.7 million improvement as compared to the Adjusted EBITDA loss of $6.3 million for the year ended December 31, 2011.

The fourth quarter of 2012 marked the 8th consecutive quarter in which the Company reported improved gross margins. The Company's 2012 gross margins of 81% are nearly a forty-two percentage point improvement over full year 2011 gross margins of 57%.

The Company recorded record revenue for the quarter ended December 31, 2012, with revenue of $10.5 million, an increase of 299% or $7.9 million over fourth quarter of 2011 revenue of $2.6 million, and a 32% increase over the third quarter of 2012. Adjusted EBITDA* for the quarter ended December 31, 2012, were $411,000, a $2.1 million

improvement as compared to the Adjusted EBITDA loss of $1.64 million for the quarter ended December 31, 2011.

60.    One week later, on March 15, 2013, MiMedx filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2012 (the "2012 Form 10-K"), which reaffirmed the Company's financial results previously announced that month.  The 2012 Form 10-K was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Gorlin, Hack, Koob, Papasan, Taylor, and Yeston and stated that defendants Petit and Senken had evaluated the effectiveness of the Company's disclosure controls and procedures.  The 2012 Form 10-K improperly claimed that MiMedx's disclosure controls and procedures were "designed to provide reasonable assurance that information required to be disclosed by the Company in [SEC filings was accurate]," and that the Company's disclosure controls and procedures were effective.  The 2012 Form 10-K stated:

**Disclosure Controls and Procedures**

***We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms.*** *Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and*

communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that ***our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.***

61.    In addition, the 2012 Form 10-K stated that the Company's "internal control over financial reporting [is] effective" and that no material changes in the Company's internal controls over financial reporting had occurred during the quarter. Specifically, the 2012 Form 10-K stated that there was "no change in our internal control over financial reporting that occurred during our latest fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

62.    The 2012 Form 10-K was certified as accurate by defendants Petit and Senken pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  Defendants Petit's and Senken's certifications acknowledged their responsibility "for establishing and maintaining disclosure controls and procedures … and internal control over financial reporting … for [MiMedx]" and incorrectly stated that they had:

(a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation; and

(d)    disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

63.    Defendants Petit and Senken also incorrectly asserted that they had disclosed any deficiencies and material weaknesses in the Company's internal controls, including:

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

64.    On May 1, 2013, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2013. For the quarter, the Company reported a net loss of $1.6 million, or $0.02 per diluted share, on revenues of $11.6 million, compared to a net loss of $1.1 million, or $0.01 per diluted share, on revenues of $3.7 million for the same period in the prior year. Defendant Petit boasted that the Company "increased revenue three fold over the prior year first quarter and continued to produce strong gross profit margins, equaling [its] fourth quarter of 2012 record gross margins of 84%."

65.    The following week, on May 10, 2013, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2013 (the "Q1 2013 Form 10-Q"). The Q1 2013 Form 10-Q reaffirmed the above announced financial results and claimed that the Company's disclosure controls and procedures

were effective.  The Q1 2013 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

66.    On July 31, 2013, the Company issued a press release announcing its financial and operating results for the second quarter ended June 30, 2013.  For the quarter, the Company reported a net loss of $757,000, or $0.01 per diluted share, on revenues of $13.51 million, compared to a net loss of $744,000, or $0.01 per diluted share, on revenues of $4.88 million for the same period in the prior year.  In the press release defendant Petit highlighted the Company's rapid growth, explaining that the Company's total revenues were up more than 175% compared to the same period in the prior year.  The press release stated:

**Management Commentary on Second Quarter Results**

Parker H. "Pete" Petit, Chairman and CEO, stated, "We are pleased with our revenue performance as we exceeded the $13.5 million upper range of our goal and achieved greater than a 175% increase over our 2012 second quarter revenue.  This was our 7th straight quarter of meeting or exceeding our revenue forecast.  We continued to produce strong gross profit margins, equaling our fourth quarter of 2012 and first quarter of 2013 record gross margins of 84%."

67.    The following week, on August 8, 2013, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2013 (the

"Q2 2013 Form 10-Q").   The Q2 2013 Form 10-Q reaffirmed the Company's financial results previously announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.   The Q2 2013 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.   These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

68.    On October 30, 2013, MiMedx issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2013.  For the quarter, the Company reported a net loss of $307,000, or $0 per diluted share, on revenues of $16.1 million, compared to a net loss of $4.2 million, or $0.05 per diluted share, on revenues of $8 million, for the same period in the prior year. The press release highlighted the Company's strong third quarter performance and included statements by defendant Petit touting the Company's impressive revenue growth:  "We are pleased with our performance this quarter.  We exceeded the $16.0 million upper range of our goal and achieved greater than a 100% increase over our 2012 third quarter revenue.  This was our 8th straight quarter where we met or exceeded the upper end of our revenue forecast."

69.    The following week, on November 8, 2013, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2013

(the "Q3 2013 Form 10-Q").  The Q3 2013 Form 10-Q reaffirmed the Company's financial results announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.  The Q3 2013 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

70.     On February 26, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2013.  For the full year fiscal 2013, the Company reported a net loss of $4.1 million, or $0.04 per diluted share, on revenues of $59.2 million, compared to a net loss of $7.7 million, or $0.09 per diluted share, on revenues of $27.1 million for 2012.  For the quarter, the Company reported a net loss of $1.4 million, or $0.01 per diluted share, on revenues of $18 million, compared to a net loss of $1.6 million, or $0.02 per diluted share, on revenues of $10.5 million, for the same period in the prior year.  In the press release, defendant Petit touted the Company's "strong quarter-over-quarter growth," and highlighted that MiMedx "more than doubled [its] revenue over 2012."

71.     The following week, on March 4, 2014, MiMedx filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December

31, 2013 (the "2013 Form 10-K"), which reaffirmed the Company's financial results previously announced that month. The 2013 Form 10-K explained that a significant portion of the Company's revenues were derived from its federal contractors, specifically AvKARE. According to the 2013 Form 10-K, distribution through the Company's agreement with AvKARE accounted for 56% of the Company's total revenue in 2013. The 2013 Form 10-K stated:

**Customer Concentration**

We provide products to Government accounts, including the Veteran's Administration, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule Contractor. ***In 2013, sales to this distributor represented 56% of our revenues.*** The distribution agreement has a term of three years ending in April 2015, and has the potential to be extended for three additional one year terms. This distribution relationship is different than our other distribution relationships in that our direct sales force calls on Government accounts to generate orders for our products, which are placed directly with the distributor. Thus, if our agreement with this distributor was terminated for any reason, including because this distributor was no longer a Federal Supply Schedule Contractor, we believe we could retain or regain that business by contracting with another distributor to service these government accounts or becoming a General Services Administration Federal Supply Schedule Contractor ourselves. Nevertheless, any disruption in the inclusion of our products on the Federal Supply Schedule for any reason could materially and adversely affect our business, revenues and results of operations.

72.    The 2013 Form 10-K was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston, and certified as

accurate pursuant to SOX by defendants Petit and Senken.  The 2013 Form 10-K again reassured the market that the Company's disclosure controls and procedures were effective.  These disclosure and certifications were substantially similar to the disclosures and certifications detailed in ¶¶62-63 above.

73.     On April 25, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2014. For the quarter, the Company reported a net loss of $900,000, or $0.01 per diluted share, on revenues of $19.6 million, compared to a net loss of $1.6 million, or $0.02 per diluted share, on revenues of $11.6 million for the same period in the prior year. The press release quoted defendant Petit highlighting the Company's impressive revenue growth: "We are very pleased with our first quarter performance. We exceeded the upper end of our guidance range and marked our 10th straight quarter of meeting or exceeding our revenue forecast.  Quarter-over-quarter revenue growth was extremely solid with a 77% increase over the first quarter of 2013."

74.     Approximately two weeks later, on May 12, 2014, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2014 (the "Q1 2014 Form 10-Q").  The Q1 2014 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q1 2014 Form 10-Q was

signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX. These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

75.    On July 28, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2014. For the quarter, the Company reported a net loss of $400,000, or $0 per diluted share, on revenues of $25.6 million, compared to a net loss of $800,000, or $0.01 per diluted share, on revenues of $13.5 million for the same period in the prior year. In the press release, defendant Petit highlighted the Company's "excellent" second quarter results, "impressive top line growth," and "record revenue" for the six months ended June 30, 2014. The press release stated:

> **Highlights include:**
> * *Revenue exceeds upper end of guidance and increases by 89% over Q2 2013 to $25.6 million*
> * *Quarter-over-quarter revenue grew by 31%*
> * *Wound Care revenue increases 181% over Q2 2013 and 40% sequentially over Q1 2014*
> * *Company issues third quarter revenue guidance of $30-$31 million with Operating Profit*
> * *Company increases full year 2014 revenue guidance to $110-$115 million*
> * *11th consecutive quarter of meeting or exceeding revenue guidance*
> * *10th consecutive quarter of positive Adjusted EBITDA\**
> * *Adjusted EBITDA\* increases by 148% over Q2 2013*

- *Free cash flow positive for quarter driven by improved A/R Days Sales Outstanding*

**Second Quarter and Six Months Ended June 30, 2014 Results**
*The Company recorded record revenue for the second quarter of 2014 of $25.6 million, a $12.1 million of 89% increase over 2013 second quarter revenue of $13.5 million, and above its latest guidance range of $24 million to $25 million.* The Company's gross margins for the quarter ended June 30, 2014 were 89% as compared to 84% in the second quarter of 2013. Earnings before interest, taxes, depreciation, amortization, share-based compensation ("Adjusted EBITDA"*) for the quarter ended June 30, 2014 were $2.9 million, a $1.7 million or 148% improvement, as compared to the Adjusted EBITDA* of $1.2 million for the second quarter of 2013. The Net Loss for the second quarter of 2014 was $0.4 million or $0.00 per diluted common share, as compared to the Net Loss of $0.8 million, or $0.01 per diluted common share, in the prior year second quarter.

*For the six months ended June 30, 2014, the Company recorded record revenue of $45.1 million, a $20.1 million or 80% increase over revenue of $25.1 million for the first six months of 2013.* The Company's gross margins for the six months ended June 30, 2014 were 87% as compared to 84% in the same period of 2013. Adjusted EBITDA* for the six months ended June 30, 2014, were $4.9 million, a $2.6 million or 113% improvement, as compared to the Adjusted EBITDA* of $2.3 million for the first half of 2013. The Net Loss for the six months ended June 30, 2014 was $1.3 million, as compared to the Net Loss of $2.4 million in the prior year same period.

**Management Commentary on Results**

*Parker H. "Pete" Petit, Chairman and CEO, said, "Our second quarter results were excellent. We achieved impressive top line growth and solid improvements to our bottom line. During the quarter, we twice increased our initial revenue guidance, and we ultimately exceeded the $25 million upper end of our latest guidance. The second quarter marked our 11th straight quarter in which we met or exceeded our revenue forecast. Our sequential quarter-over-*

*quarter revenue growth was extremely strong, with a $6.0 million or 31% increase over the first quarter of 2014.* Second quarter positive Adjusted EBITDA* of $2.9 million is the highest in our history. We are committed to continuing our progress of period-over-period revenue growth and improvements in our profitability."

76.     Roughly two weeks later, on August 11, 2014, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2014 (the "Q2 2014 Form 10-Q").  The Q2 2014 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q2 2014 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

77.     On October 30, 2014, MiMedx issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2014.  For the quarter, the Company reported net income of $3.7 million, or $0.03 per diluted share, on revenues of $33.5 million, compared to a net loss of $300,000, or $0 per diluted share, on revenues of $16.1 million, for the same period in the prior year.   The press release highlighted the Company's "extremely impressive" sequential quarter-over-quarter revenue growth and "continuing strong period-over-

period revenue growth" that significantly exceeded the upper end of MiMedx's quarterly revenue guidance. The press release stated:

**Third Quarter Highlights include:**
- *Revenue exceeds $32 million upper end of guidance*
- *Revenue increases by 108% over Q3 2013*
- *Quarter-over-quarter revenue grows by 31%*
- *12th consecutive quarter of meeting or exceeding revenue guidance*
- *2014 nine-month revenue of $78.7 million increases by 91% over 1st nine months of 2013*
- *First quarterly operating profit*
- *11th consecutive quarter of positive Adjusted EBITDA*

**Guidance Highlights include:**
- *Fourth quarter revenue expectations of $37.3 - $38.3 million*
- *Full year 2014 revenue expectations increase to $116 - $117 million*
- *Preliminary expectations for full year 2015 revenue of $175 - $185 million*
- *Preliminary expectations for full Year 2015 operating profit margin to exceed 15%*

**Revenue Results for Third Quarter and Nine Months Ended September 30, 2014**

The Company recorded record revenue for the third quarter of 2014 of $33.5 million, a $17.4 million or 108% increase over 2013 third quarter revenue of $16.1 million, and sequentially, a $7.9 million or 31% increase over second quarter of 2014 revenue. For the nine months ended September 30, 2014, the Company recorded record revenue of $78.7 million, a $37.5 million or 91% increase over revenue of $41.2 million for the first nine months of 2013.

**Management Commentary on Revenue Results**

Parker H. "Pete" Petit, Chairman and CEO, said, "***We are very pleased with our continuing strong period-over-period revenue growth, and delighted to once again announce that we have exceeded the upper end of our quarterly revenue guidance.*** Our third quarter guidance forecasted revenue to be in the range of $30 million to $32 million, and we have significantly exceeded that upper end. ***The third quarter marked our 12th straight quarter in which we met or exceeded our revenue forecast.*** Not only was our third quarter growth over 2013 outstanding with a 108% increase, our sequential quarter-over-quarter revenue growth was extremely impressive with a 31% increase over the second quarter."

78.    The following week, on November 10, 2014, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2014 (the "Q3 2014 Form 10-Q").  The Q3 2014 Form 10-Q reaffirmed the Company's financial results previously announced earlier that month and claimed that the Company's disclosure controls and procedures were effective.  The Q3 2014 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

79.    On February 26, 2015, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2014.  For the full year fiscal 2014, the Company reported net income of $6.2 million, or $0.05 per diluted share, on revenues of $118.2 million, compared to a net loss of $4.1 million, or $0.04 per diluted share, on revenues of $59.2 million

for 2013.   For the quarter, the Company reported net income of $3.8 million, or $0.03 per diluted share, on revenues of $39.6 million, compared to a net loss of $1.4 million, or $0.01 per diluted share, on revenues of $18 million, for the same period in the prior year.   The press release highlighted the Company's "continually increas[ing] [] revenue growth rate," and noted that revenue from government accounts grew 18%.  Defendant Petit proclaimed in the press release that the results purportedly "demonstrate[d] the operating leverage that [the Company] ha[s] created," and defendant Taylor bragged that "wound care revenue is growing very rapidly in both the commercial payer and federal payer segments."  The press release stated:

**Full Year and Fourth Quarter 2014 Highlights**
- *Full Year 2014 revenue of $118.2 million doubles 2013 revenue and exceeds upper end of guidance*
- *Q4 revenue of $39.6 million increases 120% over Q4 2013*
- *Q4 revenue exceeds $38.3 million upper end of guidance by $1.3 million*
- *Q4 is 13th consecutive quarter of meeting or exceeding revenue guidance*
- *2014 is 3rd consecutive fiscal year of meeting or exceeding guidance*
- *Full year 2014 Wound Care sales more than doubles full year 2013*
- *Q4 Wound Care sales grows 24% sequentially over Q3 2014*
- *2014 Commercial Accounts and Government Accounts revenue grows 208% and 18%, respectively*
- *First annual operating income of 6% of revenue recorded for full year 2014*

\*   \*   \*

## Full Year and Fourth Quarter Results

For the year ended December 31, 2014, the Company recorded record revenue of $118.2 million, a $59.0 million or 100% increase over revenue of $59.2 million for full year 2013. The Company's gross margins for the year ended December 31, 2014, were 89% as compared to 84% in the same period in 2013. Adjusted EBITDA\* for the year ended December 31, 2014, were $20.7 million, a $15.2 million or 278% improvement, as compared to Adjusted EBITDA\* of $5.5 million for the full year 2013. Net Income for the year ended December 31, 2014, was $6.2 million, or $0.05 per diluted common share, a $10.3 million improvement, as compared to the Net Loss of $4.1 million, or $0.04 per diluted common share, in the prior year same period.

The Company recorded record revenue for the fourth quarter of 2014 of $39.6 million, a $21.6 million or 120% increase over 2013 fourth quarter revenue of $18.0 million, and sequentially, a $6.1 million or 18% increase over third quarter of 2014 revenue. The Company's gross margins for the quarter ended December 31, 2014, were 91% as compared to 83% in the fourth quarter of 2013. Adjusted EBITDA\* for the quarter ended December 31, 2014, were $8.5 million, a $7.2 million or 542% improvement, as compared to Adjusted EBITDA\* of $1.3 million for the fourth quarter of 2013. The Net Income for the fourth quarter of 2014 was $3.8 million, or $0.03 per diluted common share, a $5.3 million improvement, as compared to the Net Loss of $1.4 million, or $0.01 per diluted common share, in the 2014 fourth quarter.

## Management Commentary on Revenue Results

Parker H. "Pete" Petit, Chairman and CEO, stated, "We are pleased to announce our 2014 results. ***The fourth quarter was our thirteenth consecutive quarter of meeting or exceeding revenue guidance, and full year 2014 was the third consecutive year of meeting or exceeding our guidance. Our full year revenue was double last year's revenue and fourth quarter revenue was a 120% increase over last year's fourth quarter revenue. Throughout 2014, we continually increased***

*our revenue growth rate over the prior year's quarter with a 69%*
*growth rate in the first quarter, 89% in the second quarter, 108% in*
*the third quarter and 120% in the fourth quarter."*

"It is very gratifying to report full year operating profit and net income
for the first time in our history," continued Petit. "The fourth quarter of
2014 marked the 12th consecutive quarter of positive Adjusted
EBITDA. The Company's full year 2014 gross margins of 89% were a
five percentage point improvement over 2013 record gross margins of
84%. Our fourth quarter operating profit of $4.7 million is 12% of
revenue, and full year operating profit of $7.1 million is 6% of revenue.
Our full year positive Adjusted EBITDA* was 17.5% of revenue and
fourth quarter positive Adjusted EBITDA* was 22% of revenue. These
statistics clearly demonstrate the operating leverage that we have
created with this business. Our operating leverage should become even
more evident as we report our results for future quarters."

80.    Approximately two weeks later, on March 13, 2015, MiMedx filed with

the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended

December 31, 2014 (the "2014 Form 10-K"), which reaffirmed the Company's

financial results previously announced.   The 2014 Form 10-K explained that a

significant portion of the Company's revenues were derived from its federal

contractors, specifically AvKARE.  According to the 2014 Form 10-K, distribution

through the Company's agreement with AvKARE accounted for 34% of the

Company's total revenue in 2014.  The 2014 Form 10-K stated:

**Customer Concentration**

In 2014, we provided products to Government accounts, including the
Department of Veteran's Affairs, through a distributor relationship with
AvKARE, Inc., which is a veteran-owned General Services

- 55 -

Administration Federal Supply Schedule (FSS) Contractor. In 2014, sales to this distributor represented 34% of our revenues. The distribution agreement has a term of three years ending in April 2015, but provides a renewal clause for up to two successive terms of one year each following expiration of the initial term. In 2014, we applied for, and in early 2015 received, our own FSS contract with a term through 2020, which will allow us to sell directly to governmental accounts.

81.    In addition, the 2014 Form 10-K misrepresented the Company's revenue recognition controls, claiming that revenue was recorded in the proper quarter, as appropriate, stating:

*Revenue Recognition*

The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met. A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives. For these products, revenue is recognized at the time the product has been used or implanted. The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

82.    The 2014 Form 10-K was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston, and certified as accurate pursuant to SOX by defendants Petit and Senken. The 2014 Form 10-K

again reassured the market that the Company's disclosure controls and procedures were effective. These certifications were substantially similar to the disclosures and certifications detailed in ¶¶62-63 above.

83.     On April 27, 2015, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2015. For the quarter, the Company reported net income of $4.1 million, or $0.04 per diluted share, on revenues of $40.8 million, compared to a net loss of $922,000, or $0.01 per diluted share, on revenues of $19.6 million for the same period in the prior year. In the press release, defendant Petit boasted that this quarter marked the "fourteenth consecutive quarter of meeting or exceeding revenue guidance" and defendant Taylor highlighted the Company's "achievement of hitting the upper end of [its] revenue range." The press release stated:

### Management Commentary on Revenue Results

Parker H. "Pete" Petit, Chairman and CEO, stated, "We are pleased with our first quarter results. *It was our fourteenth consecutive quarter of meeting or exceeding revenue guidance. All of our revenue segments, from our wound care business through our surgical, sports medicine and OEM segments performed well and recorded strong growth over the same period in 2014.* Even with the effects of unusually harsh weather and the reimbursement changes, we had a strong quarter. Absent those events, we believe we would have easily exceeded the upper end of our guidance range. The first quarter reflected normal seasonality associated with the new calendar year, accounting for various factors such as new deductibles, reimbursement changes and

weather. *We see the same pattern developing this year as we saw last year where each quarter has stronger growth than our first calendar quarter."*

Bill Taylor, President and COO, said, *"Our detailed strategic and tactical planning once again paid dividends in the first quarter, and our achievement of hitting the upper end of our revenue range proves that fact. Compared to our results a year ago, we again grew at a triple digit pace. Wound care sales in the first quarter grew by 103% over the first quarter of 2014. First quarter revenue in our surgical and the orthopedic/spine markets grew by 125% over the first quarter of 2014. Our wound care revenue growth continues to be the result of market share gains and increased penetration and sales from existing accounts.* We are also very pleased that we managed the expiration of pass through status for EpiFix® Medicare patients extremely well. The effects on our overall business due to this change and our subsequent actions such as our introduction of new sizes and meshed configurations occurred essentially as we predicted. We expect stronger growth in the second quarter, particularly as our mesh configuration gains more traction and the significant improvements in our health plan coverage take effect.

84.    A few days later, on May 1, 2015, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"). The Q1 2015 Form 10-Q reaffirmed the Company's financial results announced the previous week and claimed that the Company's disclosure controls and procedures were effective.  The Q1 2015 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

85.     On July 30, 2015, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2015.  For the quarter, the Company reported net income of $5.4 million, or $0.05 per diluted share, on revenues of $45.7 million, compared to a net loss of $390,000, or $0 per diluted share, on revenues of $25.6 million for the same period in the prior year.   In the press release, defendant Petit touted the Company's "excellent" second quarter results and "record revenue" for the six month period ended June 30, 2015.  According to defendant Taylor, wound care revenue growth was a result of "market share gains and expanded product usage."  The press release stated:

### Second Quarter 2015 Highlights
- *Q2 2015 is 15th consecutive quarter of meeting or exceeding Company revenue guidance*
- *Q2 2015 revenue of $45.7 million increased 79% over Q2 2014*
- *Revenue is at the upper end of Company Q2 guidance*
- *Q2 2015 Wound Care sales grew 73% over Q2 2014*

\*     \*     \*

### Second Quarter and Six Months Ended June 30, 2015 Results
*The Company recorded record revenue for the second quarter of 2015 of $45.7 million, a $20.1 million or 79% increase over 2014 second quarter revenue of $25.6 million.* The Company's gross margin for the quarter ended June 30, 2015, was 89%, equal to the gross margin in the second quarter of 2014. Adjusted EBITDA\* for the quarter ended June 30, 2015, was $10.6 million, a $7.7 million or 265% improvement, as compared to Adjusted EBITDA\* of $2.9 million for the second quarter of 2014. Net Income for the second quarter of 2015 was $5.4 million, or $0.05 per diluted common share, a $5.8 million improvement, as

compared to the Net Loss of $390,000, or $0.00 per diluted common share, in the second quarter of 2014.

***For the six months ended June 30, 2015, the Company recorded record revenue of $86.4 million, a $41.3 million or 92% increase over revenue of $45.1 million recorded in the same period of 2014.*** The Company's gross margin for the six months ended June 30, 2015, was 88% as compared to 87% in the same six month period of 2014. Adjusted EBITDA* for the six months ended June 30, 2015, was $19.3 million, a $14.4 million or 297% improvement, as compared to Adjusted EBITDA* of $4.9 million for the six months ended June 30, 2014. Net Income for the six months ended June 30, 2015, was $9.5 million, or $0.08 per diluted common share, a $10.8 million improvement, as compared to the Net Loss of $1.3 million, or ($0.01) per diluted common share, in the first six months of 2014.

**Management Commentary on Revenue Results**
Parker H. "Pete" Petit, Chairman and CEO, said, "***We had another excellent quarter. Our $45.7 million second quarter revenue was at the upper end of our guidance range of $44 to $46 million. This marks our fifteenth consecutive quarter of meeting or exceeding revenue guidance. Revenue from our Wound Care category grew by 73% over the second quarter of last year***, and in our other category, Surgical, Sports Medicine and OEM, revenue growth was 104% over the same period in 2014. We are particularly pleased with the revenue growth with our commercial customers. In the second quarter, we had revenue growth of 103% in our commercial accounts."

Bill Taylor, President and COO, commented, ***"Our wound care revenue growth continues to be the result of market share gains and expanded product usage.*** Our effective management of the expiration of pass-through status for EpiFix® Medicare patients during the first quarter of this year has paid dividends. We treated significantly more patients than in either of the last two quarters in total and the mix of large wounds treated is essentially the same as it was last year. The number of patients we treat is growing because more people need access to the more cost effective grafts we offer. However, we are also continuing to experience growth in the very large wound sizes where

amputation has generally been a resulting course of treatment. The impact of our recent introduction of new sizes and mesh configurations has been beneficial. As we expected, our mesh configuration gained substantial traction during the second quarter. With a full quarter of our mesh configurations and our new sizes being available in the market, we have seen our mix of small to large sizes improve to prior levels with approximately 80% small and 20% large."

86.    The following week, on August 7, 2015, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q").  The Q2 2015 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q2 2015 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

87.    On October 29, 2015, the Company issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2015.  For the quarter, the Company reported net income of $3.7 million, or $0.03 per diluted share, on revenues of $33.5 million, compared to a net loss of $0.3 million, or $0 per diluted share, on revenues of $16.1 million, for the same period in the prior year.  In the press release, defendant Petit touted the Company's "strong

performance," noting that both third quarter revenue and EPS exceeded analysts'

expectations.  The press release stated:

**Third Quarter 2015 Highlights are:**
- *Q3 is 16th consecutive quarter of meeting or exceeding revenue guidance*
- *YTD 2015 revenue of $135.5 million increased by 72% over same period of 2014*
- *Q3 revenue of $49 million increased by 46% over Q3 2014*
- *Q3 revenue is at upper end of $47 to $50 million guidance range*
- *Q3 gross margin of 90% is up three percentage points from 87% in first quarter of 2015*
- *Q3 is 15th consecutive quarter of positive Adjusted EBITDA\**
- *Q3 Wound Care sales grew 37% over Q3 2014*

**Guidance Highlights include:**
- *Fourth quarter 2015 revenue expectations of $49.5 - $52.5 million*
- *Full year 2015 revenue expectations of $185 - $188 million*
- *Fourth quarter 2015 operating profit margin of 14% - 15%*
- *Full year 2015 operating profit margin of 12% - 13%*

\*    \*    \*

**Management Commentary on Results**

*Parker H. "Pete" Petit, Chairman and CEO, said, "We had a very good quarter with revenue in the upper range of our guidance. Our nine month revenue of $135.5 million was a 72% increase over 2014, and our third quarter revenue grew by 46% to $49 million, compared to an exceptional third quarter of 2014. The third quarter marked our 16th straight quarter of meeting or exceeding our revenue guidance and our 15th consecutive quarter of recording positive Adjusted EBITDA\*.* Our gross margin is again increasing with third quarter gross margin of 90%, up three percentage points from 87% in the first quarter of this year. Our Wound Care revenue grew by 37% over the

third quarter of 2014. Our Surgical, Sports Medicine and OEM revenue, our other revenue category, grew by 77% over last year's third quarter. We continued to gain strong momentum in the growth of our revenue from health plans, Medicare and Medicaid with third quarter revenue from commercial accounts increasing by 71% over 2014. During the quarter, we added over 350 new commercial/non-government customers. ***Adding to the fact that both our third quarter revenue and EPS exceeded our analyst consensus estimates, I would say that is strong performance."***

88.    The following week, on November 6, 2015, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q").  The Q3 2015 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective.  The Q3 2015 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

89.    On February 23, 2016, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2015.  For the full year fiscal 2015, the Company reported net income of $29.4 million, or $0.26 per diluted share, on revenues of $187.3 million, compared to a net income of $6.2 million, or $0.05 per diluted share, on revenues of $118.2 million for 2014.    For the quarter, the Company reported net income of $13.4

million, or $0.12 per diluted share, on revenues of $51.8 million, compared to a net income of $3.8 million, or $0.03 per diluted share, on revenues of $39.6 million, for the same period in the prior year.  In the press release, defendant Petit highlighted the Company's consistent quarter-over-quarter revenue growth, and noted that the fourth quarter of 2015 marked the seventeenth consecutive quarter the Company met or exceeded its revenue guidance.  The press release stated:

**Full Year 2015 Highlights are:**
- *4th consecutive year of meeting or exceeding revenue guidance*
- *Revenue of $187.3 million increased by 58% over 2014*
- *Revenue nears upper end of MiMedx guidance range*
- *Gross margin of 89% remains unchanged from its record level in 2014*
- *Wound Care sales grew by more than 50% in 2015*
- *Surgical, Sports Medicine & Orthopedics revenue grew more than 85% in 2015*
- *Adjusted EBITDA\* of $44 million represents a 113% improvement over 2014*
- *Net income of $29.4 million represents a 373% improvement over 2014*

**Fourth Quarter 2015 Highlights are:**
- *17th consecutive quarter of meeting or exceeding revenue guidance*
- *Revenue of $51.8 million increased by 31% over Q4 2014*
- *Revenue in upper range of MiMedx Q4 guidance*
- *Gross margin of 90%*
- *16th consecutive quarter of positive Adjusted EBITDA\**
- *Adjusted EBITDA\* of $12.9 million represents a 51% improvement over Q4 2014*
- *Net income of $13.4 million represents a 249% improvement over Q4 2014*

* * *

## Management Commentary on Results

Parker H. "Pete" Petit, Chairman and CEO, said, "*We are pleased with our 2015 results which were accomplished in spite of a year of price decreases caused by the Centers for Medicare and Medicaid Services ("CMS") pass through expiration on our EpiFix® allografts. The fourth quarter marked our 17th straight quarter of meeting or exceeding our revenue guidance. Our 2015 Wound Care revenue grew by more than 50% and Surgical, Sports Medicine and Orthopedics ("SSO") revenue increased by more than 85%.* A strategic imperative for the Company was to propel our growth rate in SSO sales, and we clearly executed on that strategy."

"Our profit performance during 2015 was equally as impressive," added Petit. "The fourth quarter was our 16th consecutive quarter of recording positive Adjusted EBITDA*. Our Net Income for the fourth quarter of $13.4 million was a 249% improvement over the fourth quarter of 2014, and the full year Net Income increased by 373% to a record $29.4 million. 2015 was definitely a year of considerable top line and bottom line growth, and one that any CEO would be pleased to report."

90.     Roughly one week later, on February 29, 2016, MiMedx filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K"), which reaffirmed the Company's financial results previously announced that month.  The 2015 Form 10-K explained that a significant portion of the Company's revenues were derived from its federal contractors, specifically AvKARE.  According to the 2015 Form 10-K, distribution through the Company's agreement with AvKARE accounted for 24% of the Company's total revenue in 2015.  The 2015 Form 10-K stated:

**Customer Concentration**

The Company provides products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc. ("AvKARE"), which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In addition, in 2014, the Company applied for, and in early 2015 received, its own FSS contract with a term through 2020, which allows the Company to sell directly to Government accounts. The initial term of the distribution agreement with AvKARE was due to expire in April 2015 but it has been extended via amendment through June 30, 2017, with the ability to further extend under certain circumstances. The agreement with AvKARE, as amended, allows the Company to sell its products directly on the FSS. Ultimately, the Company intends to transition all of its Government sales to sales sold directly to Government accounts on the FSS. In 2015, sales to AvKARE represented approximately 24% of total revenue.

91.      In addition, the 2015 Form 10-K explained the Company's revenue recognition practices, and stated that revenue was recorded in the appropriate quarter:

*Revenue Recognition and Sales Returns, Discounts, and Allowances Accruals*

The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met. A portion of the Company's revenue is generated from inventory maintained at hospitals

or with field representatives. For these products, revenue is recognized at the time the product has been used or implanted. The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

92.    The 2015 Form 10-K was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston, and certified as accurate pursuant to SOX by defendants Petit and Senken. The 2015 Form 10-K again reassured the market that the Company's disclosure controls and procedures were effective. These disclosure and certifications were substantially similar to the disclosures and certifications detailed in ¶¶62-63 above.

93.    On April 25, 2016, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2016. For the quarter, the Company reported net income of $1.2 million, or $0.01 per diluted share, on revenues of $53.4 million, compared to a net income of $4.1 million, or $0.04 per diluted share, on revenues of $40.8 million for the same period in the prior year. In the press release, defendant Petit commented on the Company's first quarter results and financial projections for the second quarter and full year 2016:

**Management Commentary on Results**

\*   \*   \*

Petit continued, "*I am very pleased to report that in the first three weeks of April, our revenue is up over 25% compared to the first three weeks of January. This is very encouraging, and it probably indicates that our system changes are beginning to take effect.* However, in no way should this be construed that we expect second quarter revenue to be 25% higher than first quarter revenue. This is merely a statistic that indicates for this three week period, the issues that negatively impacted the first quarter's sales productivity should be behind us. There could be other factors that may reduce that efficiency as the second quarter progresses."

**Outlook for Second Quarter and Full Year 2016**

\* \* \*

"In spite of our accelerated revenue ramp rate compared to early January, the variables related to the new Stability Biologics products roll-outs, and the remaining optimization and utilization of our new SMS, we think it is prudent to adjust our financial projections for the second quarter and full year 2016. *While we are slightly lowering our projections, they still represent a full year revenue growth rate in excess of 30%* and Adjusted EPS\* growth rate of 43% over 2015 Adjusted EPS\* of $0.21. We want to very quickly return to the same predictable performance that yielded the 17 straight quarters of performing at or above expectations," concluded Petit.

94.     Approximately two weeks later, on May 10, 2016, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q"). The Q1 2016 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls and procedures were effective. The Q1 2016 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and

- 68 -

Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

95.    On July 26, 2016, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2016.  For the quarter, the Company reported net income of $2 million, or $0.02 per diluted share, on revenues of $57.3 million, compared to a net income of $5.4 million, or $0.05 per diluted share, on revenues of $45.7 million for the same period in the prior year.   In the announcement, defendant Petit touted the considerable progress MiMedx was making across all of its product lines, particularly in its Wound Care business.  The press release stated:

### Results for Second Quarter and Six Months Ended June 30, 2016

The Company recorded record revenue for the 2016 second quarter of $57.3 million, an $11.6 million or 26% increase over 2015 second quarter revenue of $45.7 million. The Company's Adjusted Gross Margin for the second quarter of 2016 was 88.1%, compared to 88.9% in the second quarter of 2015. Adjusted EBITDA* for the second quarter of 2016 was $10.1 million, a $488,000 decrease as compared to Adjusted EBITDA* of $10.6 million for the second quarter of 2015. Adjusted Net Income for the second quarter of 2016 was $5.1 million, or $0.05 per diluted common share, a $749,000 decrease, as compared to Adjusted Net Income of $5.9 million, or $0.05 per diluted common share, in the second quarter of 2015.

For the six months ended June 30, 2016, the Company recorded record revenue of $110.7 million, a $24.3 million or 28% increase over revenue of $86.4 million recorded in the same period of 2015. The Company's Adjusted Gross Margin* for the six months ended June 30,

2016, was 87.3%, compared to 88.2% Adjusted Gross Margin* in the same period of 2015. Adjusted EBITDA* for the six months ended June 30, 2016, was $19.1 million, a $180,000 decrease as compared to Adjusted EBITDA* of $19.3 million for the six months ended June 30, 2015. Adjusted Net Income for the six months ended June 30, 2016, was $10.1 million, or $0.09 per diluted common share, a $673,000 decrease as compared to Adjusted Net Income of $10.7 million, or $0.09 per diluted common share, in the same period of 2015.

**Management Commentary on Results**

Parker H. "Pete" Petit, Chairman and CEO, stated, "***We are very pleased with our progress in all of our product lines, and particularly the Wound Care portion of our business.*** We are also pleased with the progress we are making with our surgical products, especially now that our SSO and Wound Care sales organizations are separate, but have highly coordinated efforts. Our second quarter 2016 Wound Care revenue grew 18% over the second quarter of 2015. While commercial Wound Care nicely exceeded our expectations, the federal Wound Care revenue was lower than expected due to a Veterans Administration ("VA") directive to all hospitals that changed their consignment processes for implants and caused disruption to purchasing patterns. These issues are now generally resolved in all but a few hospitals. ***Our Wound Care revenue for the first six months of 2016 grew 24% over the first six months of 2015.***"

96.    The following week, on August 2, 2016, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q"). The Q2 2016 Form 10-Q reaffirmed the Company's financial results announced the week prior and claimed that the Company's disclosure controls and procedures were effective. The Q2 2016 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and

Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

97.    On October 27, 2016, the Company issued a press release announcing the Company's financial and operating results for the third quarter ended September 30, 2016.  For the quarter, the Company reported net income of $3.3 million, or $0.03 per diluted share, on revenues of $64.4 million, compared to a net income of $6.6 million, or $0.06 per diluted share, on revenues of $49 million, for the same period in the prior year.  Defendant Petit bragged in the press release that the Company once again exceeded its revenue guidance and "continue[s] to add to [its] record of 20 consecutive quarters of sequential revenue growth."  Likewise, in the announcement defendant Taylor touted the Company's "very strong growth," particularly in its Wound Care business.  The press release stated:

**Management Commentary on Results**

Parker H. "Pete" Petit, Chairman and CEO stated, "*We are very pleased with our third quarter results on both the top as well as bottom line. It is always gratifying to exceed our revenue guidance, and continue to add to our record of 20 consecutive quarters of sequential revenue growth. Equally as impressive is our record of meeting or exceeding our revenue guidance in 19 of the last 20 quarters.* Our core advanced Wound Care revenue was the driver of our revenue performance, especially revenue from commercial accounts. Third quarter revenue is typically impacted by vacations of medical professionals, and we are pleased with our third quarter results in spite of that fact. We are very satisfied with the revenue trend we have seen in the last two quarters and are enthusiastic about the fourth quarter and beyond. With the trend

we are experiencing, the robust growth we anticipate from AmnioFill™ and OrthoFlo Lyophilized, the two new product lines we launched during the third quarter, and the fact that many year-end patient deductibles are met during or before the fourth quarter, we are optimistic about our fourth quarter revenue."

Bill Taylor, President and COO, said, "*For the first nine months of 2016, we had very strong growth over the first nine months of 2015, with our Wound Care revenue growing 30% and our SSO revenue growing 28% as compared with the same period in 2015.* We are especially pleased with the third quarter performance of our Wound Care team. Led by the growth from our commercial accounts, our third quarter 2016 Wound Care revenue grew 39% over the third quarter of 2015. All of our product lines showed solid progress and maturation within our new organizational structure that has separated the Wound Care and SSO sales teams into two distinct but highly coordinated organizations. We expect this new structure to demonstrate further positive improvements in our sales effectiveness as each team continues to mature as separate organizations.

\*     \*     \*

"Continued additions to our Wound Care direct sales force will also drive growth. Year-to-date, we have added an additional 27 Wound Care sales professionals. *The momentum we saw in Q2 2016 commercial Wound Care growth along with the expected rebound in Federal orders, the continued aggressive hiring of Wound Care sales professionals and expected additional international orders give us assurance in hitting our annual Wound Care growth target of over 25 percent.* In summary, our second quarter revenue growth gives us confidence that we will stay on track to achieve our growth goals for the third quarter and full year," added Petit.

98.     The following week, on November 8, 2016, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q").  The Q3 2016 Form 10-Q reaffirmed the Company's

financial results previously announced and claimed that the Company's disclosure controls and procedures were effective. The Q3 2016 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX. These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

99.    On February 23, 2017, MiMedx issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2016. For the full year fiscal 2016, the Company reported net income of $12 million, or $0.11 per diluted share, on revenues of $245 million, compared to a net income of $29.4 million, or $0.26 per diluted share, on revenues of $187.3 million for 2015. For the quarter, the Company reported net income of $5.5 million, or $0.05 per diluted share, on revenues of $69.9 million, compared to a net income of $13.4 million, or $0.12 per diluted share, on revenues of $51.8 million, for the same period in the prior year. In the press release, defendant Petit emphasized that the Company's fourth quarter performance marked "21 consecutive quarters of sequential revenue growth and 20 of 21 quarters of meeting or exceeding [MiMedx's] revenue guidance." The press release stated:

**Full Year 2016 Highlights are:**
•    *Revenue is a 31% increase over full year 2015 revenue*
•    *Revenue of $245.0 million within range of MiMedx guidance*

- *Wound Care revenue of $184 million is a 30% increase over 2015*

**Fourth Quarter 2016 Highlights are:**
- *Revenue grew 35% over Q4 2015 revenue*
- *Revenue of $69.9 Million within range of MiMedx Q4 2016 guidance*
- *Wound Care revenue grew 32% over Q4 2015*

\* \* \*

**Management Commentary on Results**

Petit said, "We are very pleased with the performance of both of our sales verticals during 2016 and especially during the fourth quarter. ***Our fourth quarter revenue performance was within our guidance, and it marked 21 consecutive quarters of sequential revenue growth and 20 of 21 quarters of meeting or exceeding our revenue guidance.*** Our core advanced wound care revenue, led by our commercial accounts, was the primary contributor to our record fourth quarter performance.

\* \* \*

Bill Taylor, President and COO, noted, ***"Our 2016 Wound Care revenue of $184.0 million grew by 30% and Surgical, Sports Medicine and Orthopedics ("SSO") revenue of $61.0 million increased by 32% over 2015. In the fourth quarter, Wound Care performed extremely well, growing 32% over the fourth quarter of 2015.*** Our SSO revenue grew significantly and increased by 44% over the 2016 fourth quarter, despite lower than expected fourth quarter revenue from Stability Biologics. EpiFix®, the Company's flagship product, continues to drive our leadership position in the advanced wound care market. EpiFix is very strong with both our commercial wound care accounts, as well as government accounts."

\* \* \*

**Revenue Breakdown**

The Company distinguishes revenue in two categories: (1) Wound Care and (2) SSO, which includes Original Equipment Manufacturer ("OEM") applications. **_For fourth quarter of 2016, Wound Care revenue was $52.8 million, representing 75.5% of total revenue_**, and SSO (including OEM) revenue was $17.1 million, representing 24.5% of total revenue.

100.    The following week, on March 1, 2017, MiMedx filed with the SEC its Annual Report on Form 10-K for the fourth quarter and fiscal year ended December 31, 2016 (the "2016 Form 10-K"), which reaffirmed the Company's financial results previously announced.   The 2016 Form 10-K explained that management had identified a deficiency in its internal control over financial reporting relating to the Company's accounting for income taxes.  The Company admitted that the deficiency constituted a material weakness in its internal controls over financial reporting, but assured the investing public that it had developed and begun implementing a remediation plan to address the control deficiency that led to the material weakness. Among other things, the remediation plan included the increased involvement of defendants Senken and Cranston.  According to the 2016 Form 10-K, these measures were designed both to remediate the material weakness and "generally strengthen [MiMedx's] internal control over financial reporting."  In discussing the remediation plan, the 2016 Form 10-K stated:

Remediation Plan: Management has begun implementing a remediation plan to address the control deficiency that led to the material weakness. The remediation plan includes the following:

- 75 -

- Implementing specific review procedures, including the increased involvement of our CFO and Controller as well as the hiring of an internal tax specialist to oversee the work performed by the third - party tax specialists.

- Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. We currently plan to have our enhanced review procedures and documentation standards in place and operating in the first quarter of 2017. Our goal is to remediate this material weakness by the end of the first quarter of 2017, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

101.   In addition, the 2016 Form 10-K summarized the Company's revenue recognition practices with regard to its agreement with AvKARE, and claimed that revenues were properly recorded in the appropriate quarters:

*Revenue Recognition*

The Company sells its products through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the

contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

Some of the Company's sales to Government accounts, including the Department of Veterans Affairs, are made through a distributor relationship with AvKARE, which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) contractor. The Company's agreement with AvKARE expires, subject to certain for-cause termination rights, on June 30, 2017. The Company may also elect to terminate the agreement without cause and pay a termination fee to AvKARE as specified in the agreement. Upon termination of the agreement, the parties may mutually agree to extend the agreement or the Company has an obligation to repurchase AvKARE's remaining inventory, if any, within ninety (90) days in accordance with the terms of the Agreement. At the end of the term, the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement.

***We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured.*** A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

***We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized.*** We base our estimate for sales returns, discounts and allowances on historical sales and product return information, including historical experience and actual and projected trend information as well as projected sales returns based on estimated usage and contractual

arrangements with AvKARE. These estimates have historically been consistent with actual results.

102.    The 2016 Form 10-K was signed by defendants Petit, Senken, Bleser, Dewberry, Evans, Hack, Koob, Papasan, Taylor, and Yeston, and certified as accurate pursuant to SOX by defendants Petit and Senken.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

103.    On April 28, 2017, MiMedx issued a press release announcing the Company's financial and operating results for the first quarter ended March 31, 2017. For the quarter, the Company reported net income of $4.3 million, or $0.04 per diluted share, on revenues of $72.6 million, compared to a net income of $1.2 million, or $0.01 per diluted share, on revenues of $53.4 million for the same period in the prior year.  The press release proclaimed that the Company experienced a "solid performance" in the first quarter, with a revenue increase of 36% for the first quarter of 2017, compared to the same quarter in 2016, and defendant Petit boasted that the Company exceeded the top end of [its] revenue guidance."  The press release stated:

**First Quarter 2017 Highlights**
- *Revenue grew 36% over Q1 2016 revenue*
- *Revenue of $72.6 million exceeds upper end of MiMedx guidance range*
- *Wound Care revenue of $54.9 million grew 40% over Q1 2016*
- *Surgical, Sports Medicine and Orthopedics (SSO) revenue of $17.7 million grew 26% over Q1 2016*

- ***24th of last 25 quarters of meeting or exceeding revenue guidance***

*   *   *

**Management Commentary on Results**

Parker H. "Pete" Petit, Chairman and CEO stated, "***We are pleased to have exceeded the top end of our revenue guidance and to have recorded very solid performance on our revenue and profit growth.*** In light of the impact of the normal seasonality that the market experiences in the first quarter of the year, we are especially satisfied with our growth. With respect to our profit performance, our first quarter GAAP Net Income grew by well over 250% compared to Q1 2016, our Adjusted Net Income grew by 51% over the first quarter of 2016, and our Adjusted EBITDA* grew by 37% over Q1 2016. We expect our profit metrics as a percent of revenue to increase as the year progresses."

Bill Taylor, President and COO, said, "***Both of our sales verticals had strong growth with Wound Care revenue increasing by 40% over the first quarter of 2016 and SSO growing by 26% compared to the first quarter of last year.*** We are also extremely pleased with our strong operating cash flow performance compared to last year's first quarter. Our cash flow from operations was $10.6 million, compared to a negative $1.0 million in the first quarter of 2016. We had another very favorable decline in Days Sales Outstanding (DSO) in our Accounts Receivable during the quarter, which continued the trend experienced in the last half of 2016."

104.    A few days later, on May 1, 2017, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q"). The Q1 2017 Form 10-Q reaffirmed the Company's financial results previously announced and claimed that the Company's disclosure controls

and procedures were effective.  The Q1 2017 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

105.    On July 26, 2017, MiMedx issued a press release announcing the Company's financial and operating results for the second quarter ended June 30, 2017.  For the quarter, the Company reported net income of $8.1 million, or $0.07 per diluted share, on revenues of $76.4 million, compared to a net income of $2 million, or $0.02 per diluted share, on revenues of $57.3 million for the same period in the prior year.  In the press release, defendant Petit again touted the Company's remarkable consistency in meeting or beating revenue guidance (twenty five out of the last twenty six quarters).  The press release stated:

**Second Quarter 2017 Highlights**
- **Q2 2017 Revenue of $76.4 million exceeds MiMedx guidance range of $73.5 to $75.0 million**
- **Q2 2017 Revenue grew 33% over Q2 2016 revenue**
- **Wound Care revenue of $54.7 million grew 30% over Q2 2016**
- **Surgical, Sports Medicine and Orthopedics (SSO) revenue of $21.7 million grew 42% over Q2 2016**
- **25 of 26 quarters of meeting or exceeding revenue guidance**

\* \* \*

**Management Commentary**

Parker H. "Pete" Petit, Chairman and CEO stated, "*We are very pleased with our second quarter results. We exceeded the top end of our guidance and produced impressive earnings and cash flow. The second quarter was our 26th consecutive quarter of sequential revenue growth, the 25th of the last 26 quarters of meeting or exceeding our revenue guidance*, and our 22nd consecutive quarter of positive Adjusted EBITDA. Our second quarter performance generated strong operating cash flow of $13.5 million, an 85% increase over prior year. We continued to make significant improvement in our collection of accounts receivable during the quarter, and we ended the quarter with a Days Sales Outstanding (DSO) of 72 which exceeded our internal target of 75."

106.    A few days later, on July 31, 2017, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q").  The Q2 2017 Form 10-Q reaffirmed the Company's financial results announced the week prior and claimed that the Company's disclosure controls and procedures were effective.  The Q2 2017 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX.  These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

## REASONS THE STATEMENTS WERE IMPROPER

107.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    MiMedx lacked adequate internal controls over accounting and financial reporting;

(b)    MiMedx failed to employ proper compliance measures to ensure appropriate accounting practices;

(c)    MiMedx was improperly recognizing revenue on its federal supply contracts that had not yet been realized;

(d)    MiMedx's financial statements materially overstated the Company's revenue and earnings;

(e)    MiMedx failed to disclose its financial ties to physicians, as required by federal law; and

(f)    as a result of the foregoing, the Individual Defendants' representations concerning MiMedx's business and operations were improper.

## THE INDIVIDUAL DEFENDANTS CONTINUED TO MISLEAD THE MARKET AS MIMEDX'S SCHEME BEGAN TO UNRAVEL

108.    In early September, an investigative news company, *The Capital Forum*, issued a report stating that it had confirmed that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx."  On September 7, 2017, the Company responded with a press release acknowledging the investigation, but stating that it was not the subject of it. The press release stated:

MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ("VA") Office of Inspector General, but the Company is not a target of that investigation. The Company is assisting with the investigation as requested by the government. To the extent there has been any innuendo by The Capitol Forum or others that somehow MiMedx is a target, that is simply incorrect based on available information.

109. Two weeks later, on September 20, 2017, two research groups—

Aurelius Value and Viceroy Research—published separate reports expressing

concerns about the risks of serious and pervasive fraud at MiMedx.  The Aurelius

Value report, titled "MiMedx Flying Too Close to the Sun," highlighted a number

of red flags indicating potential illegal activity at MiMedx.   Aurelius Value

summarized its findings:

> We see large undiscounted channel stuffing and kickback risks lurking beneath the surface at MiMedx (NASDAQ: MDXG). This report specifically exposes:
>
> - Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes.
>
> - Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts". Not only does the alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.

- Documents showing that over 40 podiatrists across the country, including the current President of the American Podiatric Medical Association, received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.

110.    Viceroy Research similarly reported that MiMedx had "serious issues in senior management, acquisitions, operations, and accounts…"  The Viceroy Research report explained that their investigation into MiMedx revealed evidence of channel-stuffing and noted that "the MiMedx-AvKARE supplier-distributor relationship [was] extremely suspicious."  In addition, Viceroy Research explained that their Freedom of Information Act ("FOIA") request was withheld by the SEC, suggesting that MiMedx was the target of an undisclosed SEC enforcement investigation.

111.    MiMedx once again denied these accusations, labeling the allegations of "channel-stuffing" in the Aurelius Value and Viceroy Research reports as "false," and sued each of the organizations for libel, slander, and defamation.  On March 9, 2018, MiMedx voluntarily dismissed the claims against Viceroy Research. However, litigation against Aurelius Value and *The Capitol Forum* is ongoing.

112.    On September 21, 2017, the Company issued a press release "announc[ing] its interactions with the [SEC]."  In the press release, defendant Petit disclosed that the Company has been "assembl[ing] summary documentation to

supply to the SEC, which would include information from the investigation conducted by the Board of Directors and others."   Defendant Petit also acknowledged that the Company had "received a subpoena from the SEC that appears to relate to the former employees' allegations and is primarily related to the matters that were the subject of the Company's previously disclosed internal investigation."  The press release stated:

> First, as is disclosed in the Company's public filings, the Company already satisfactorily addressed a comment letter from the SEC earlier this year, which letter covered a variety of topics, including the Company's revenue recognition policies and procedures.  The Company received the close out letter from the SEC on April 27, 2017.  No restatement was required as a result of that comment letter.

> Separately, Parker H. "Pete" Petit, CEO, said, "After the counterclaims alleging channel-stuffing were filed by the terminated employees last December, we began to assemble summary documentation to  supply to the SEC, which would include information from the investigation conducted by the Board of Directors and others.  We were in the process of taking the same proactive approach we took with the Department of Veterans Affairs (VA) as reported in our previous press release dated September 7, 2017. The Company then received a subpoena from the SEC that appears to relate to the former employees' allegations, and primarily is related to the matters that were the subject of the Company's previously disclosed internal investigation."

> The Company reported that it is working with the SEC in its investigation of these accusations and supplying all of the documents requested, including those obtained through the civil lawsuit discovery process to help the Commission understand what has transpired.

> The Company believes that the matters related to the subpoena were reviewed as part of the completed investigation conducted by the Audit

Committee of the MiMedx Board of Directors, independent outside legal counsel, the Company's independent auditors, and executive management. The Company also engaged a nationally recognized expert in revenue recognition who reviewed and confirmed the Company's revenue recognition practices to be proper. To MiMedx's knowledge, no proceedings have been initiated against MiMedx by the SEC or any other governmental agency at this time.

Petit added, "We are providing our fullest cooperation to the Commission, and we hope to clear up this inquiry relatively quickly. We believe that the government's investigation will confirm our Audit Committee's prior findings. We view this activity in much the same way as the subpoena we received from a suit nearly three years ago which was filed by an executive of a competitor. We had nothing to hide, and cooperated fully. Within a matter of months the agency declined to intervene. We expect to have a similar result here."

113.    On October 23, 2017, First Analysis analyst Joseph Munda suspended his price target for MiMedx, saying that the Company had excluded First Analysis from asking questions on several calls while spending substantial time sparring with short sellers and filing lawsuits. The First Analysis report explained that the number of unanswered questions was growing and asserted that MiMedx's increased stock price was driven by regulatory and compliance factors instead of fundamentals.

114.    On this news, the Company's stock fell $2.60 per share, or nearly 20%, over the next two trading days to close at $11.30 per share on October 24, 2017, erasing more than $288.6 million in market capitalization.

115.    On October 26, 2017, the Company issued a press release announcing the Company's financial and operating results for the third quarter ended September

30, 2017.  For the quarter, the Company reported net income of $17.5 million, or

$0.15 per diluted share, on revenues of $84.6 million, compared to a net income of

$3.3 million, or $0.03 per diluted share, on revenues of $64.4 million, for the same

period in the prior year.  In the press release, defendant Petit touted the Company's

"impressive" third quarter results and "extremely strong growth in revenue."  The

press release stated:

**Third Quarter 2017 Financial Highlights**
- *Q3 2017 revenue of $84.6 million exceeded MiMedx guidance range of $79 to $80 million*
- *Q3 2017 revenue grew 31% over Q3 2016 revenue*
- *Wound Care revenue of $61.9 million grew 24% over Q3 2016*
- *Surgical, Sports Medicine and Orthopedics (SSO) revenue of $22.7 million grew 56% over Q3 2016*
- *26 of 27 quarters of meeting or exceeding revenue guidance*
- *Distributor and OEM revenue was below 5%*

\* \* \*

**Management Commentary**

Parker H. "Pete" Petit, Chairman and CEO stated, "***Our third quarter results were impressive and showed extremely strong growth in revenue***, robust increases in profit, solid reduction of accounts receivable DSOs and substantive increase in our cash flow from operations. ***Based on all factors for measuring an organization's performance, this was an outstanding quarter. I am extremely pleased with the momentum our sales organization has built, and it continues to strengthen quarter over quarter.*** All of our operational, administrative and corporate functions are contributing to this growing momentum."

Bill Taylor, President and COO, said, "***We are particularly pleased that we achieved such strong third quarter results even with the disruptions and terrible effects of the hurricanes.*** We continue to expand our direct sales force in order to capture the significant market opportunities available to the Company. Our direct sales currently account for more than 95% of our total revenue. Our network of distributors and Original Equipment Manufacturer (OEM) accounts represent less than 5% of total revenue. ***Our strategy to establish a significant direct sales presence in many 'secondary markets' has proven to be quite effective and a solid contributor to our growth.***"

116.    Defendant Petit also commented on the Aurelius Value and Viceroy Research articles, and asserted that the "short sellers" were engaged in a "coordinated scheme… against the Company."  Defendant Petit stated:

"Along with our excellent third quarter operational results and the multiple advances we made in our clinical study initiatives, the third quarter marked significant progress in numerous other areas. We made significant headway in our legal actions defending our intellectual property and protecting against patent infringement. We successfully cleared all protracted hurdles put up by the defendants, and are now set for our first patent trial in January 2018. Also, we reached settlement in one and won many favorable judicial rulings in our other lawsuits against employees terminated for selling competitive products. Additionally, we have taken the appropriate legal actions against short sellers and others, and have taken steps to publically expose the coordinated scheme levied against the Company by these short sellers. We will not stand for the tortious interference and damage to the value of our shareholders' investment in MiMedx caused by the illegal actions of these short sellers and their 'free speech' shills," concluded Petit.

117.    Two days later, on October 28, 2017, the Company held an earnings conference call with analysts and investors in connection with third quarter 2017 results.  Following MiMedx's opening remarks, the Company opened the line to

analysts' questions.   Piper Jaffray analyst Matt O'Brien asked about the allegations
of improper sales practices at MiMedx, to which defendant Petit provided assurances
that there was no corporate malfeasance at the Company and attributed any
improprieties to "rogue" sales people.  The following exchange took place:

> <**Q - Matt O'Brien**>: Thanks, and good morning. Thanks for taking
> my questions. Can we just kind of stick on some of these allegations
> that are running around out there a little bit more, and just given your
> interaction with the employees that you terminated, what have you
> learned from a compliance perspective to ensure that some of these
> issues don't persist going forward? And on the compliance processes
> side, what have you done to really ramp-up your assurances that there
> isn't anything nefarious going on, just anything you can provide as we
> kind of try to draw this whole thing out, I think would be helpful?

> <**A - Parker H. Petit**>: Okay. Well, first of all, from our standpoint,
> what was disappointing is us not finding out about to last – basically
> December about these sales from these individuals going onto to their
> own LLCs and own companies, that should have bubbled up to our
> compliance system, et cetera. A year prior to that, we had a situation
> develop where one of the managers out in the Midwest, it was bubbled
> up right through our compliance system, within 48 hours it was
> investigated and he was terminated.

> This situation, these individuals were a lot more shrewd than that
> particular individual. And I told people well, corporate knows about
> this, quote, unquote. Don't worry about it. Well, I just kind of kept it
> quiet for too long. So, we've done a lot of education and again in terms
> of what's proper, what is not proper. We can't – when you have 300
> salespeople out there, you have 800 employees, somebody can go rogue
> on you and you just have to have a system set up that will highlight that
> quickly. We have two very efficient systems, if people would use them.
> We've used this as an example to all of the current people, particularly
> salespeople of what went wrong here and how off base it got, and how

they must report this kind of misdoings or malfeasance quickly so we can deal with it.

So from that standpoint, this could have been a better learning experience, even though from a corporate standpoint, *there's no malfeasance. We had some rogue employees.* So we've learned a lesson and use that to, as a teaching moment as I used to call it with my children, is a teaching moment – broad teaching moment for all of our folks. But in terms of buttoning up systems here, we're in pretty doggone good shape, and three years ago we were too. Again, I refer right to the fact that we've gone through this drill once before. All the allegations made in that qui tam were basically these same allegations and we went through that with Department of Justice and came out within months and they didn't step into that case and the case was dropped. So, we're not naïve or not inexperienced in this area and we've got pretty doggone good systems. But are there going to be cases that can go off the ranch from time-to-time? Yes. *But in terms of this company doing the right things, we know the regulations, we follow them, we educate, we get people to sign documents, they have been educated, but that doesn't keep some individual from getting an idea and going off base with it.*

We had a situation here in Atlanta called our attention a week or so ago and it turned out one of our salespeople here was trying to help a friend and he put his name on a corporation she was setting up. Well, there's nothing wrong with that, but when the short sellers locate that they try to make something out of it. Okay? We do not sell through [ph] PODs (56:29), period. All this stuff in Texas is just a lot of noise, but they'll dig up a name and they'll relate it through another social media matter and tie them together and say that's an indication of channel stuffing, or something else.

We will refute these things as we've been doing on our website when they've got some anywhere near merit to them and explain them quickly and move on. But it's gotten very noisy and it will continue to get noisy because these individuals are very focused on [indiscernible] (57:03) their notion and *there is no corporate malfeasance here. And there are some little issues here and issues there that have cropped*

*up, but I think from a corporate entity, we are doing everything we can.* And the one thing that came out, by the way, the – three years ago, the OIG investigation, they recommended we add one more person to the compliance staff here, which we did. So, that's the status on that.

118.    On October 31, 2017, MiMedx filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"). The Q3 2017 Form 10-Q reaffirmed the Company's financial results announced earlier that month and claimed that the Company's disclosure controls and procedures were effective. The Q3 2017 Form 10-Q was signed by defendant Senken, and was certified as accurate by defendants Petit and Senken pursuant to SOX. These certifications were substantially similar to the certifications detailed in ¶¶62-63 above.

119.    On November 9, 2017, in a public forum hosted by Canaccord Genuity, defendant Petit reiterated that the Company was not engaged in any irregular revenue recognition practices and assured analysts that MiMedx had compliance practices in place to prevent accounting improprieties. The following exchange took place between Canaccord Genuity analyst Kyle W. Rose and defendant Petit:

**<Q - Kyle William Rose>**: While I got you up here, I mean, I can't avoid the question of wanting to talk about some of the allegations and some of the back and forth that's going on in the stock this year with the company and then some groups of investors. So, there's been a lot of back and forth regarding improper sales practices, channel stuffing, sales [ph] to position on (14:45) distributors. I guess while you're here,

how much of your business comes from PODs today or stocking distributors?

\* \* \*

[Defendant Petit:] So, people that were dishonest with us, they've tied in with these short sellers and they're just creating information. We're trying to post and are posting on our website these allegations, they just keep coming. But most – all of them, when you look at, we've got 10 years of audited financial statements. We've got a big four auditing firm now.

**We went through the board, went through a very serious lengthy litigation when these first allegations came up last December, did the things we're supposed to do. Brought in a revenue recognition expert.** These people have no idea about business processes here. They've never seen the actual contract. They just keep throwing stuff out there with an email that has nothing to do with anything relating to their favorite word, channel stuffing.

**You can't run a business like we've run it, have a cash flow we have and the strength of the balance sheet we have and do "channel stuffing" or any kind of malfeasance, it's just not possible, so.** But they are very artful at what they do, and over time here, we'll keep performing, and we'll get to an audit here shortly which should be number 11 and this soon will take care of itself.

120.    On January 7, 2018, MiMedx issued a press release announcing the Company's preliminary financial results for the fourth quarter and fiscal year ended December 31, 2017.  For the full year fiscal 2017, the Company reported revenues of $324.5 million, compared to revenues of $245 million for 2016.  For the quarter, the Company reported revenues of $90.9 million, compared to revenues of $69.9 million, for the same period in the prior year.  In the press release, defendant Petit

touted the Company's "strong quarter-over-quarter growth," and highlighted that

MiMedx "more than doubled [its] revenue over 2012." The press release stated:

**Management Commentary**

Parker H. "Pete" Petit, Chairman and CEO stated, "The fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth and 27 of 28 quarters of meeting or exceeding our revenue guidance. At the end of November, we expected we would exceed our revenue forecast for the quarter, as we indicated in our press release on November 30, 2017. We forecasted December to be a solid growth month, and our sales force more than lived up to our expectations with a robust month to close out the year. We are entering 2018 with strong momentum that should produce an exciting 2018."

\* \* \*

"We anticipate 2018 to be another year of highly predictable quarter over quarter revenue growth, continued strengthening of our balance sheet and cash position, and significant gains in profitability. Shareholders should be reminded that the 2017 numbers reported in this press release are preliminary numbers based on management's best estimates, and we look forward to our planned press release on February 23, 2018 detailing our 2017 financial results. We also plan to host our standard live broadcast of our 2017 financial results on February 23, 2018," concluded Petit.

121.    On February 15, 2018, Aurelius Value published an article titled "An

Open Letter to the MiMedx Auditors," detailing "serious and pervasive fraud" within

the Company. According to the article, MiMedx, through its primary VA distributor,

AvKARE, had been "using AvKARE's consignment agreements to hit sales targets

by filling shelves before the end of quarters with excess product that neither

AvKARE nor the VA had requested." "Since MiMedx recognized revenue as soon as product is shipped to stocking distributors, as opposed to when the product is implanted," the Company was able to recognize revenue that had not yet been realized or realizable and earned.

122. MiMedx finally began to acknowledge the truth behind its business practices on February 20, 2018. On that date, MiMedx announced in a press release that it was postponing its fiscal year 2017 earnings release and that it would be unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), by the prescribed due date. The announcement revealed that the Company's inability to timely file its 2017 Form 10-K was the result of an Audit Committee investigation into the Company's sales and distribution practices. The press release stated:

### MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results

**Marietta, Georgia**, February 20, 2018 -- MiMedx Group, Inc. (NASDAQ: MDXG), a leading developer and marketer of regenerative and therapeutic biologics, today announced that it will postpone the release of its financial results, as well as the filing of its Form 10-K, for the year ended December 31, 2017.
The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts.

The Audit Committee is working closely with its advisors to complete this investigation in as timely a manner as possible. The Company will not be in a position to release its financial results until the Audit Committee's internal investigation is completed.

The Company believes, based on information available to date, that the outcome of such investigation should not have a material impact on revenue guidance for 2018. The Company's unaudited cash and cash equivalents as of December 31, 2017 were approximately $33 million, after giving effect to the use of approximately $24 million for share repurchases in the fourth quarter of 2017 as part of the Company's Share Repurchase Program. The Company had no debt outstanding as of December 31, 2017. The Company also does not expect this delay to affect its operational performance and clinical research activities.

"Our Board of Directors and executives believe it is in the best interests of our Company and shareholders for our Audit Committee to address these allegations in an internal investigation with the support of independent legal and accounting advisors. We look forward to releasing our 2017 financial results as soon as this process is complete," said Parker H. "Pete" Petit, Chairman and CEO. "MiMedx has been experiencing rapid growth over the last few years as our product portfolio continues to meet significant, unmet needs in the marketplace. We are literally saving lives by saving limbs, and we expect to continue to deliver operational and clinical success in the months and years to come."

123.    On this news, MiMedx' market capitalization plunged nearly 40% or $5.72 per share, on February 20, 2018, to close at $8.75 per share compared to the previous trading day's closing of $14.47 per share, erasing more than $635 million in market capitalization in a single day.

124.    Two days later, on February 22, 2018, MiMedx's market capitalization took another dive when *The Wall Street Journal* published the article revealing MiMedx violated the Physician Payments Sunshine Act by failing to disclose payments the Company made to more than twenty doctors.

125.    On this news MiMedx's stock price fell $1.05 per share, or approximately 12%, on February 22, 2018, to close at $7.83 per share on February 23, 2018, erasing more than $116 million in market capitalization.

126.    On February 26, 2018, *Bloomberg* reported that, in addition to the previously disclosed investigations, the DOJ was also investigating the Company's distribution practices as well as whether MiMedx overcharged government contractors for its products.  In the article, titled "U.S. Probes MiMedx's Federal Contracts, Accounting," *Bloomberg* reported that several former employees had confided in interviews that the "the company has inflated its financials by recognizing revenue on products that had been shipped to certain distributors but not used."  The *Bloomberg* article stated:

> Biotech firm MiMedx Group, which jolted investors last week by delaying its year-end earnings announcement, is under U.S. Justice Department scrutiny related to a pair of business practices, according to people familiar with the matter.
>
> ***Federal authorities are investigating whether the Marietta, Georgia-based company overcharged the government for its tissue-repair***

*products, said a person with knowledge of the matter. The Justice Department is also looking into MiMedx's distribution practices -- including whether it inappropriately booked sales of products that hadn't been ordered, a practice known as channel stuffing -- according to several others familiar with that probe.*

\* \* \*

**Sales to Government**

In a second line of inquiry, federal agents are said to be looking into the company's sales to the government. MiMedx charged government customers higher prices for what was essentially the same product it was selling to others, according to two former employees. One of them said that late last year, the Federal Bureau of Investigation collected emails, sales reports, marketing materials, pricing charts and pay details as part of an inquiry into MiMedx's government sales.

If MiMedx overcharged taxpayers, it could face significant penalties. Federal prosecutors are looking into whether the company's tissue-graft sales violated the False Claims Act, the government's primary tool for policing fraud against federal agencies, according to the former employee who described the FBI's inquiries on condition of anonymity.

MiMedx has "significant sales" to government customers including the U.S. Department of Veterans Affairs and the Department of Defense, according to its most recent annual report.

\* \* \*

Three other former employees, who asked not to be identified, told Bloomberg in interviews that company executives at times asked salespeople to meet targets by shipping products that hadn't been ordered.

127.    When this news reached the market, MiMedx's stock price fell $0.48 per share, or approximately 6%, to close at $7.35 per share on February 26, 2018, erasing more than $53 million in market capitalization.

128.    Then, on March 2, 2018, the Company filed a Form 12b-25 stating that its third quarter Form 10-Q would not be filed on time because the internal review was not yet complete.  That same day, after the stock market closed, the Company announced that it had received a notice from NASDAQ earlier that day, stating that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it did not timely file its Annual Report on Form 10-K for the year ended December 31, 2017.

129.    Roughly two weeks later, in a March 15, 2018 press release, the Company announced that it had recently been made aware of a DOJ investigation into its practices.  The press release further stated that, in light of the Audit Committee's investigation, "the Company no longer intends to post responses to [] allegations [that have been made against it and its employees]."

130.    On May 9, 2018, three former employees at the VA—Donna Becker ("Becker"), Marcela Dolores Ferrer ("Ferrer"), and Carol Guardiola ("Guardiola")— were indicted on charges that they accepted thousands of dollars from MiMedx for

pushing certain of its products at the VA and committing healthcare fraud.[3] According to the indictment, from 2012 to 2016, Becker, Ferrer, and Guardiola received benefits from the Company in the form of meals, salaries, trips, gifts, and other gratuities in return for excessively using MiMedx's products on patients. The indictment further alleged that Becker and Farrer had not just received gratuities, but also participated in speaking engagements on MiMedx's behalf aimed at increasing sales to VA facilities.

131.    On May 18, 2018, MiMedx announced that it had received an additional notice from NASDAQ on May 14, 2018, stating that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it did not timely file its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018, with the SEC. The announcement did not provide any indication of when the Company expected to complete its review and file its belated financial statements.

132.    On June 7, 2018, the Company filed with the SEC a Current Report on Form 8-K that disclosed that on June 6, 2018, the Audit Committee, which had been overseeing the internal review of the Company's financial statements, had reached preliminary findings, and that management, in consultation with the Audit

---

[3] *U.S. v. Becker*, U.S. District Court, District of South Carolina, No. 18-cr-481.

Committee and Board, had determined that MiMedx's financial statements for fiscal years 2012 to 2016, as well as the interim periods of 2017 would need to be restated. As disclosed in the Form 8-K, MiMedx had been *operating with "material weaknesses" in internal controls over financial reporting during each of the above noted periods*, and that its previously filed financial statements for those periods "*should no longer be relied upon.*"

133.     The Form 8-K also disclosed that the restatements would focus on the timing of revenue recognition and were expected to result in MiMedx restating certain revenues, expenses, and related balance sheet accounts as reported in prior periods.  The Company further disclosed that the adjustments would affect, among other things, gross margin, operating income, income before taxes, net income, and earnings per share in above mentioned periods.   While the Company did not definitively quantify the impact of the necessary adjustments to its prior financial statements, MiMedx admitted that the restatement would have a material impact on the financial statements relating to certain of the above-noted periods.  The Company was unable to provide assurance that additional errors would not be identified or impact prior accounting periods.  The Form 8-K stated:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On June 6, 2018, the Audit Committee of the Board of Directors (the "Board") of MiMedx Group, Inc. (the "Company"), with concurrence from management of the Company, concluded that the Company's previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015 and 2016 and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017 (collectively, the "Non-Reliance Periods"), should be restated (the "Restatement"), and therefore, such consolidated financial statements and other financial information, any press releases, investor presentations or other communications related thereto should no longer be relied upon. Additionally, as a result of the foregoing, all communications and financial information with respect to the fourth quarter of 2017 and the first quarter of 2018 should no longer be relied upon, and the Company is further withdrawing all prior financial guidance issued for 2018.

As previously announced, the Audit Committee has been conducting an independent investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company and certain other matters. ***The determination of the need to restate was based on investigation results to date which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods. The Restatement will have a material impact on the financial statements relating to certain of the Non-Reliance Periods.***

***The accounting misstatements will also require adjustments to the periods in which such revenues were recognized so that such revenues for product sold are recognized in the period in which such amounts were actually collected. This will also affect gross margin, operating income, income before taxes, income taxes, net income, earnings per share, accounts receivable and related reserves, returns***

- 101 -

*allowances, inventories, and other financial items in particular periods.*

The Audit Committee investigation is ongoing, continues to evaluate sales and distribution practices at other distributors and customers, and may ultimately result in the identification of additional issues, broaden the scope of financial items or periods required to be restated, may result in additional actions taken by the Company, and may affect the preliminary conclusions expressed above. The Company does not intend to provide additional updates on the results of the investigation until it is concluded or the Company determines that further disclosure is appropriate or necessary.

Although the Company cannot at this time estimate when it will file its restated financial statements and its Annual Report on Form 10-K for the year ended December 31, 2017 and subsequent interim periods, it is diligently pursuing completion of the Restatement and intends to make such filings as soon as reasonably practicable.

The Company has previously concluded in certain of the periods requiring restatement that its controls over financial reporting were effective. In the period ending December 31, 2016, the Company previously concluded that its controls over financial reporting were ineffective due to material weaknesses in certain internal controls over tax accounting. *As a result of material weaknesses relating to the Restatement described above, the Company has now concluded that its controls over financial reporting were ineffective in all of the Non-Reliance Periods. Accordingly, the Company will restate its disclosures for the affected periods to include the identification of material weaknesses related to its restatement.*

In addressing the concerns discussed herein, the Audit Committee and the Company are in the process of considering and implementing remedial measures, with a view toward improved accounting and internal control practices. In particular, the Company has established an Ethics and Compliance Committee and has established the positions of Chief Accounting Officer and Internal Auditor.

134.    In addition, without providing further details, the Form 8-K announced the immediate departures of defendants Senken and Cranston.  The Form 8-K stated:

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

On June 7, 2018, the Company announced that Michael J. Senken has left his role as the Company's Chief Financial Officer, effective June 6, 2018. Mr. Senken will remain with the Company in a transitional role ending June 30, 2018. The Company also announced that John E. Cranston has left his role as Vice President, Corporate Controller and Treasurer, effective June 6, 2018. Mr. Cranston will remain with the Company in a transitional role ending June 30, 2018. As part of this transition, on June 6, 2018, the Company's Board of Directors appointed Edward J. Borkowski, Executive Vice President of the Company, as interim Chief Financial Officer, effective June 6, 2018. The Company is initiating a search process to identify permanent replacements for these positions. The Chief Accounting Officer position is currently vacant and the Company is conducting a search to fill this role.

135.    On this news, MiMedx's market capitalization fell more than 23%, or $1.92 per share, on June 7, 2018, to close at $6.29 per share compared to the previous trading day's closing of $8.21 per share, erasing more than $213 million in market capitalization in a single day.

136.    On June 11, 2018, *Bloomberg* published an article titled "Federal Probes at MiMedx Carry a Familiar Ring for CEO," detailing eerily similar channel stuffing schemes defendant Petit had perpetrated during his time at Healthdyne Inc. ("Healthdyne") and Matria Healthcare, Inc. ("Matria"), as well as the troubles

currently facing MiMedx.  The article explained that, "[i]n interviews, 19 current and former executives and employees of his companies describe a hard-charging leader—one who didn't dwell on the rules as he pursued revenue growth, according to about a dozen of them."  The *Bloomberg* article further stated:

> Over more than four decades as a health-care entrepreneur, Petit built up medical-device companies that later came under scrutiny, one by the Justice Department and another by the Securities and Exchange Commission. Those companies settled without admitting wrongdoing, and Petit says they strove to comply with both the spirit and the letter of the law.

> Now he may be facing a stiffer challenge, with both the Justice Department and the SEC investigating sales practices and government contracts at MiMedx, and short sellers circling. Last month, three health-care workers were indicted over allegations they accepted bribes from MiMedx representatives. Announcing last week that years of financial results may not have been accurate, MiMedx also said two top finance executives had stepped down.

> *  *  *

> ***More than a half-dozen former MiMedx employees interviewed by Bloomberg, who requested anonymity, said they saw little upside to flagging any potential misconduct while working there, an understanding that flowed from what they called an us-vs.-them culture nurtured by Petit.  Several of them noted that while Petit has publicly encouraged workers to write "Dear Pete" letters reporting wrongdoing, he created a culture internally in which workers were reluctant to criticize practices.***

137.    Then, on July 2, 2018, in a press release and Current Report filed on Form 8-K, the Company announced the resignation of its CEO, defendant Petit, and

its President and COO, defendant Taylor. According to the announcement, these resignations, which followed those of defendants Senken and Cranston "are based on the Board of Directors' business judgment regarding the Company's leadership and direction, and arise, in part, from information the Audit Committee has identified through its previously announced independent investigation."

138.    On this news, MiMedx's market capitalization plunged nearly 40%, or $2.46 per share, on July 2, 2018, to close at $3.93 per share compared to the previous trading day's closing of $6.39 per share, erasing more than $270 million in market capitalization in a single day. In total, from February 16, 2018, the trading day before the truth began to emerge, and July 2, 2018, when defendant Petit resigned as CEO, the Company's stock price fell $10.54 per share, or 72%, erasing more than $1.17 billion in market capitalization in less than six months.

139.    On July 23, 2018, *The Wall Street Journal* published the aforementioned article titled "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth," detailing the channel-stuffing at MiMedx. *The Wall Street Journal* reported that its review of company emails, court documents, internal complaints, and interviews with current and former employees, "paint[ed] a picture of a company seeking to grow at almost any cost."

140.    Three days later, on July 26, 2018, MiMedx announced that it had received a letter from the NASDAQ staff notifying the Company that its stock could be delisted as a result of its failure to file timely SEC filings.  The press release stated:

> On July 10, 2018, MiMedx notified the Nasdaq staff that the Company will be unable to bring its SEC filings up to date by the initial August 28, 2018 deadline previously communicated by the Nasdaq staff. Consequently, on July 20, 2018, the Company received an anticipated letter from the Nasdaq staff, stating that, because MiMedx will not regain compliance with Nasdaq Rule 5250(c) (1) by such initial deadline, the Nasdaq staff had determined that the Company's stock will be delisted unless the Company requests a hearing before a Nasdaq Listing Qualifications Panel ("Hearings Panel") by July 27, 2018. The non-compliance with Nasdaq Rule 5250(c) (1) relates to the Company's delinquency in filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 and its Quarterly Report for the quarterly period ended March 31, 2018.

141.    On August 31, 2018, the Company filed a Current Report on Form 8-K disclosing that Bank of America was terminating its longstanding credit line with MiMedx as a result of the Company's failure to file timely periodic reports with the SEC.

142.    On September 20, 2018, the *Atlanta Journal Constitution* reported that the Veterans Affairs Medical Center in Minneapolis had "parted ways" with five doctors "over improprieties with [MiMedx's] biopharma products."

143.    On September 20, 2018, the Company issued a press release confirming the wrongdoing by defendants Petit, Senken, Taylor, and Cranston.  The press release announced that defendant Petit had resigned from the Board, effective immediately, and that the Company was treating the previously announced separations of defendants Petit, Senken, Taylor, and Cranston as terminations "for cause."  According to the press release, the Board's determinations that these four former executives engaged in conduct detrimental to the Company were based on information identified as part of the Audit Committee's belated, and still incomplete, investigation.

144.    To date, the Company has still not completed its restatements for the fiscal years ended December 31, 2012, December 31, 2013, December 31, 2014, the fiscal year ended December 31, 2015, December 31, 2016, the fiscal quarters within such fiscal years, and the interim periods of 2017, and the Company has not filed Annual or Quarterly Reports on Forms 10-K or Forms 10-Q since October 31, 2017, nearly a year ago.  Nor has the Company provided any estimates as to when any of these filings or restatements are likely to be completed.  The last mention of the restatement, made in the Company's Form 12b-25 filed on August 13, 2018, stated that its second quarter Form 10-Q would not be filed on time because the internal

review was not yet complete, but the "Audit Committee [was] working closely with its advisors to complete this investigation in as timely a manner as possible."

## DAMAGES TO MIMEDX

145.    As a result of the Individual Defendants' improprieties, MiMedx disseminated improper, public statements concerning the Company's financial success, compliance with Generally Accepted Accounting Principles ("GAAP"), internal controls, and business forecasts.  These improper statements have devastated MiMedx's credibility as reflected by the Company's staggering ***$1.17 billion market capitalization loss*** between February 16, 2018, the trading day before MiMedx first began to disclose its accounting improprieties, and July 2, 2018, when defendant Petit resigned as CEO.

146.    The Individual Defendants' illegal practices and gross failures to timely address, remedy, or even disclose such practices also severely damaged MiMedx's reputation within the business community and in the capital markets.  In addition to price, MiMedx's current and potential customers consider a company's ability to timely file its financial results, accurately account for revenues, and evaluate its own financial results and growth.  Businesses and government entities are less likely to award contracts to companies that pass off excessive inventory to distributors knowing that the products will not be sold.  In addition, MiMedx's ability to raise

equity capital or debt on favorable terms in the future is now impaired. The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in, and lending money to the Company.

147.    Further, as a direct and proximate result of the Individual Defendants' actions, MiMedx has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from the Company's internal investigations and review of the accounting violations;

(b)    costs incurred from restating and revising several years' worth of financial statements;

(c)    costs incurred from defending and paying any potential settlement in the Securities Class Actions for violations of federal securities laws;

(d)    costs incurred in complying with the investigations by the SEC, DOJ, and VA; and

(e)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to MiMedx.

## DERIVATIVE AND DEMAND ALLEGATIONS

148.    Plaintiff brings this action derivatively in the right and for the benefit of MiMedx to redress injuries suffered, and to be suffered, by MiMedx as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof by the Individual Defendants. MiMedx is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

149.    Plaintiff will adequately and fairly represent the interests of MiMedx in enforcing and prosecuting its rights.

150.    Plaintiff was a stockholder of MiMedx at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current MiMedx stockholder.

151.    The Board had an affirmative duty under Florida law to conduct a reasonable, objective, and good faith investigation into the allegations in the Demand, and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims have merit and whether pursuing the claims in litigation would be in the Company's best interests. Boards that fulfill their duty to investigate a stockholder's litigation demand reasonably, objectively, and in good faith, and to act reasonably on the basis of the investigation, retain the protections of

- 110 -

the business judgment rule's presumption that they acted independently, on a reasonably informed basis, and in good faith. Boards that fail to do so may not avail themselves of this presumption, and the stockholder's litigation demand will be deemed to have been wrongfully refused.

152.  On April 10, 2018, on behalf of plaintiff, plaintiff's counsel sent the Demand letter to the Board, demanding the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging MiMedx, including certain of the Company's current and former officers and directors.[4]

153.  After more than two months without a response from the Company, plaintiff sent MiMedx another letter on June 15, 2018, detailing additional facts supporting his concerns that the fiduciaries of MiMedx breached their fiduciary duties.  In particular, plaintiff's letter explained that in May 2018, three former employees at the VA were indicted on charges that they accepted thousands of dollars from MiMedx in exchange for pushing certain of its products at the VA.  As additional evidence of wrongdoing, the June 15, 2018 letter also discussed the Company's admission that it would need to restate more than five years' worth of

---

[4] A true and correct copy of the Demand is attached hereto as Exhibit A.

financial statements as a result of MiMedx's accounting treatment of certain sales and distribution practices, and the sudden and unexpected departures of defendants Senken and Cranston.

154.    In his June 15, 2018 letter, plaintiff also expressed concern over the Board's failure to conduct an independent investigation into these allegations.  The letter explained that the Company's internal investigation was plagued by severe conflicts of interest.  In fact, MiMedx's internal investigation was being led by defendant Dewberry, defendant Petit's college fraternity "little brother" and colleague for nearly forty years.  Plaintiff's counsel noted that this was particularly concerning given that defendant Petit is most responsible for the wrongdoing at MiMedx.

155.    In light of the foregoing, plaintiff urged the Board to conduct an independent investigation into the issues identified in plaintiff's initial demand, as well as:  (i) the circumstances surrounding the indictment of the three VA employees on charges they accepted bribes from MiMedx; (ii) the circumstances surrounding the Company's need to restate more than five years of financial statements; (iii) the sudden departures of defendants Senken and Cranston; (iv) the independence of the Company's Audit Committee members conducting the investigation into MiMedx's

sales and distribution practices; and (v) the improper corporate culture the Company's fiduciaries promoted or allowed to continue for a number of years.[5]

156.    Nearly three months after plaintiff sent his initial Demand, the Board finally responded.   In a letter dated July 2, 2018, Edmund Polubinski III ("Polubinski") from the law firm of Davis Polk & Wardwell LLP, stated that the Board had created the Special Committee to investigate plaintiff's Demand, and that his firm was retained to assist the Special Committee.  The letter explained that the Special Committee was unable to provide an estimate of when the investigation would be complete, as it had yet to begin its investigation.

157.    Lastly, counsel requested that plaintiff provide evidence that he "owned MiMedx stock during the entire period relevant to the allegations in the Demand and that he continues to own the Company's stock."   In requesting this information, counsel stated that "under Florida law, a demanding shareholder must not only be a current shareholder but also must have owned the corporation's stock at the time of the conduct alleged in the demand," without providing any actual legal citation.[6]

---

[5] A true and correct copy of the June 15, 2018 letter is attached hereto as Exhibit B.

[6] A true and correct copy of the July 2, 2018 letter is attached hereto as Exhibit C.

158.   In response, on July 20, 2018, plaintiff sent counsel for the Special Committee a letter urging the Special Committee to take into account more recent developments while considering his Demand.  Plaintiff's letter advised the Special Committee to investigate the sudden resignations of defendants Petit and Taylor, which the Company stated arose "from information the Audit Committee [] identified through its… independent investigation." In conducting its investigation, plaintiff's counsel directed the Special Committee to:  (i) review any and all communications with the DOJ, SEC, and VA regarding the Company's sales and distribution practices; (ii) conduct interviews with current or former Company employees, officers, and directors who were responsible for the wrongful conduct; and (iii) evaluate the internal documentation regarding its controls over its accounting practices.

159.   Plaintiff's July 20, 2018 letter also expressed concern over the Board's delay in investigating the matters raised in plaintiff's Demand.  Plaintiff noted that the Special Committee was just beginning its investigation in July 2018; three months after plaintiff first demanded the Board investigate accounting improprieties, violations of federal law, and other wrongdoing at MiMedx.  In addition, although plaintiff's counsel disputed the Special Committee's counsel's interpretation of Florida law and the relevancy of this to the Board's need to investigate the serious

wrongdoing at the Company, to avoid further delay, plaintiff's counsel enclosed documentary evidence demonstrating Plaintiff's ownership of MiMedx stock during the relevant time period and evidence of his initial purchase.[7]

160.    Having received scant information concerning the Special Committee and its ongoing investigation, in an August 29, 2018 letter, plaintiff's counsel requested the identities of the "independent directors" that formed the Special Committee and the identities of the individuals serving on the Special Committee.[8]

161.    Counsel for the Special Committee responded on September 12, 2018.[9] According to Polubinski's September 12, 2018 letter, the Special Committee was formed on June 6, 2018 by a vote of defendants Papasan, Dewberry, Aguilar, Hack, Evans, Bleser, and Yeston.  The Special Committee is made up of defendants Aguilar, Yeston, and Bleser.

162.    The Special Committee was not an independent committee due to defendant Bleser's longstanding business relationship with defendant Petit. Defendant Petit founded Healthdyne in 1970 as Life Systems, and Healthdyne

---

[7] A true and correct copy of the July 20, 2018 letter is attached hereto as Exhibit D.

[8] A true and correct copy of the August 29, 2018 letter is attached hereto as Exhibit E.

[9] A true and correct copy of the September 12, 2018 letter is attached hereto as Exhibit F.

completed its initial public offering in 1981. In 1995 Healthdyne split into three companies by: (i) completing the spin-off of subsidiary Healthdyne Information Enterprises, Inc. ("HIE"); (ii) distributing its majority ownership in Healthdyne Technologies, Inc. ("Healthdyne Technologies"); and (iii) causing its home obstetrical care division Healthdyne Maternity Management ("HMM") to complete a merger of equals with Tokos Medical Corporation to create Matria. Defendants Petit and Bleser concurrently served on the board of directors of HIE from March 1995 until HIE was spun off from Healthdyne in November 2000 and changed its name to Healthcare.Com Corporation ("Healthcare.Com"). Defendants Petit and Bleser concurrently served on the board of directors of Healthcare.Com from October 1997 until Healthcare.Com merged with XCare.net in August 2001, forming Quovadx Inc. ("Quovadx"). From March 1995 until May 1998, defendant Bleser was also employed as the CFO and Treasurer of Healthcare.Com and as Vice President, Finance from August 1995 until October 1997. Defendant Bleser also served as a consultant to Healthcare.Com from May 1998 through the merger with XCare.net until June 2004. In addition, defendants Bleser and Petit concurrently served on the board of directors of Matria from October 2004 until it was sold to Inverness Medical Innovations in May 2008, during which time defendant Petit also served as Matria's CEO and Chairman of the Matria's board of directors.

163.    Defendants Bleser and Petit's relationship of working together for more than two decades demonstrates that their close ties go beyond just a normal business relationship.  Furthermore, in his employment at the aforementioned companies, defendant Bleser received substantial compensation.

164.    As a result of their long-standing business relationship and the substantial rewards defendant Bleser reaped from defendant Petit, defendant Bleser is beholden to defendant Petit.  Accordingly, defendant Bleser cannot independently consider the Demand with the requisite disinterestedness.

165.    More than five months have passed since plaintiff demanded MiMedx investigate the allegations detailed herein, giving the Board ample time to undertake an investigation, evaluate plaintiff's Demand, and determine an appropriate response.  Furthermore, at least one member of the Special Committee, defendant Bleser, supposedly began investigating these allegations more than eight months ago in connection with the Audit Committee's investigation.  Notwithstanding this passage of time, the Special Committee has yet to complete its investigation and has not given plaintiff any estimate of when it plans to do so.

166.    Given the Board's unreasonable delay in investigating these matters, and the Special Committee's lack of independence, plaintiff has no choice but to file this complaint now in order to preserve valuable claims for the Company.

167.    Plaintiff has not made any demand on the other shareholders of MiMedx to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     MiMedx is a publicly held company with over 111 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of MiMedx and because of their ability to control the business and corporate affairs of MiMedx, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage MiMedx in a fair, just, honest, and equitable manner.

170.    The Individual Defendants and each of them violated and breached their fiduciary duties of care and loyalty.

171.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) for years the Company was improperly recognizing revenue in violation of GAAP; (ii) for years the Company was overstating its revenue; (iii) for years the Company lacked adequate financial and internal controls; and (iv) as a result of the forgoing, at least five years of representations concerning the Company's revenue, impressive revenue growth, business prospects, and financial controls were improper.   The Officer Defendants further breached their fiduciary duty of candor by failing to ensure the timely restatement of several of the Company's financial statements, and failing to ensure the timely filing of MiMedx' financial statements.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

172.    The Director Defendants, as directors of the Company, owed and owe MiMedx the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly issuing or recklessly permitting the Company to issue improper statements.   The Director Defendants knew or were reckless in not knowing that:

(i) for years the Company was improperly recognizing revenue in violation of GAAP; (ii) for years the Company was overstating its revenue; (iii) for years the Company lacked adequate financial and internal controls; and (iv) as a result of the forgoing, at least five years of representations concerning the Company's revenue, impressive revenue growth, business prospects, and financial controls were improper. The Director Defendants further breached their fiduciary duty of candor by failing to ensure the timely restatement of several of the Company's financial statements, and failing to ensure the timely filing of MiMedx's financial statements. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

173.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

174.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MiMedx has sustained significant damages, as alleged

herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

175.    Plaintiff, on behalf of MiMedx, has no adequate remedy at law.

## COUNT II

**Against the Individual Defendants for Waste of Corporate Assets**

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Actions that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to restating and revising its past financial statements.

178.    Finally, as a result of the decision to allow the Company to operate in an environment devoid of adequate internal and financial controls, the Individual Defendants have caused MiMedx to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

- 121 -

179.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

180.    Plaintiff, on behalf of MiMedx, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

181.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

182.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of MiMedx.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to MiMedx.

183.    Plaintiff, as a stockholder and representative of MiMedx, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

184.    Plaintiff, on behalf of MiMedx, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of MiMedx, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Ordering defendants to provide to plaintiff and the investing public accurate operational reports and financial statements for all previous quarters and years identified by the Audit Committee as inaccurate;

C.    Ordering defendants to take whatever measures are reasonably necessary to ensure they publish timely and accurate operational reports and financial statements for all quarterly and annual periods going forward;

D.    Directing MiMedx to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MiMedx and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

- 123 -

1.      a proposal to strengthen Board oversight and supervision of MiMedx's business and sales practices, including distribution practices;

2.      a proposal to strengthen the Company's internal controls over accounting and financial reporting;

3.      a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

5.      a provision to permit the stockholders of MiMedx to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of MiMedx has an effective remedy;

F.     Awarding to MiMedx restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  September 27, 2018          **JOHNSON FISTEL, LLP**

                                   */s/ Michael I. Fistel, Jr.*
                                   MICHAEL I. FISTEL, JR.
                                   (Ga. Bar No.: 262062)

                                   William W. Stone (Ga. Bar No.: 273907)
                                   Murray House
                                   40 Powder Springs Street
                                   Marietta, GA 30064
                                   Telephone: (470) 632-6000
                                   Facsimile: (770) 200-3101
                                   michaelf@johnsonfistel.com
                                   williams@johnsonfistel.com

**ROBBINS ARROYO LLP**
Brian J. Robbins
Craig W. Smith
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsarroyo.com
csmith@robbinsarroyo.com

*Counsel for Plaintiff*

## VERIFICATION

I, Andrew Georgalas, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _9/24/18_____

_____
Andrew Georgalas